2008 ME 161

**Vivian HARVEY**

v.

**H.C. PRICE COMPANY et al.**

Supreme Judicial Court of Maine.

Argued: April 8, 2008.
Decided: Oct. 21, 2008.

Anne–Marie L. Storey, Esq. (orally), Rudman & Winchell, Bangor, ME, for H.C. Price Company.

James J. MacAdam, Esq. (orally), Nathan A. Jury, Esq., David E. Hirtle, Esq., MacAdam Law Offices, P.A., Portland, ME, for Vivian Harvey.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

LEVY, J.

[¶ 1] H.C. Price Company appeals from a decision of a Workers' Compensation Board hearing officer (*Sprague, HO*) assigning a 12% permanent impairment rating to Vivian Harvey that includes 7% for the psychological sequela of a work-related physical injury. H.C. Price contends it was error to assign a percentage of impairment to the psychological component of the injury based on the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (4th ed.1993), required for use when rating permanent impairment. We affirm.

## I. FACTUAL BACKGROUND

[¶ 2] Vivian Harvey is fifty-two years old and lives in Ohio. In 1999, while working as a laborer on a pipeline project in Maine for H.C. Price, she suffered an injury to her lower right leg when a log came loose from the back of a piece of equipment and struck her. She lost a substantial amount of skin, and her treatment included a skin graft. She suffers chronic pain from the injury and has been out of work since.

[¶ 3] H.C. Price paid Harvey ongoing partial incapacity benefits and, in 2003, filed a petition to determine the extent of her permanent impairment. The hearing officer (*Jerome, HO*) determined that Harvey suffered 5% whole person permanent impairment from the leg injury. Shortly thereafter, Harvey filed her own petition to determine the extent of permanent impairment, asserting that she suffers from depression as a result of the 1999 injury, and seeking to have the psychological component of her injury rated and added to the 5% permanent impairment already allocated to the leg. H.C. Price then filed a petition for review and to cease paying benefits because Harvey's permanent impairment level was below the 11.8% statutory threshold and she had been paid partial benefits beyond the maximum number of weeks.

[¶ 4] Harvey was examined by Dr. Newcomb, a psychiatrist. He diagnosed

her as suffering from a major depressive disorder, but because she had not yet received any treatment, he determined that she had not reached maximum medical improvement for that condition as of August 2006. She began psychiatric treatment in Ohio in October 2006, and was prescribed medication. She improved somewhat, but because of side effects, her doctor changed her prescription after three months.

[¶ 5] In the course of this litigation, Harvey was examined by Dr. Lobozzo, an independent medical examiner (IME) appointed pursuant to 39–A M.R.S. § 312 (2007). He diagnosed her as having a major depressive disorder related to the 1999 work injury, and determined that she suffers 7% permanent impairment as a result. The hearing officer adopted this opinion, and concluded that when combined with the impairment from her leg, Harvey suffers 12% whole person permanent impairment. Because this exceeds the 11.8% threshold, the hearing officer denied the employer's petition for review, and determined that Harvey is entitled to continue to receive benefits.

[¶ 6] H.C. Price filed a motion for additional findings of fact and conclusions of law, which the hearing officer denied. It then filed a petition for appellate review, which we granted pursuant to 39–A M.R.S. § 322 (2007) and M.R.App. P. 23. We consolidated this case with *Capella v. Clean Harbors Environmental Services*, WCB–07–618, for the purposes of appeal, and oral argument was held jointly in the two cases. However, we resolve the cases in separate decisions.

## II. DISCUSSION

[¶ 7] The Workers' Compensation Act has long recognized the compensability of work-related mental stress injuries, as well as the psychological sequelae of physical work injuries. *See* 39–A M.R.S. § 201(3) (2007); *Townsend v. Me. Bur. of Pub. Safety*, 404 A.2d 1014, 1016–17 (Me.1979); *Cote v. Osteopathic Hosp. of Me., Inc.*, 447 A.2d 75, 78 (Me.1982). The question presented in this appeal is whether the Board may give a numerical percentage rating to permanent impairment associated with the psychological component of a work injury, despite the fact that the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993) (AMA *Guides*) does not assign numerical impairment percentages to non-neurological psychological conditions, as it does for other types of impairment.

[¶ 8] To address this question we examine, in order: (A) the Act's definition of "permanent impairment" and its role in the determination of the duration of benefit payments; (B) the fourth edition of the AMA *Guides's* treatment of permanent impairment; and (C) the independent medical examiner's approach to evaluating permanent impairment in this case and the hearing officer's decision adopting that approach. In the discussion that follows, we conclude that the Act's definition of "permanent impairment" and the Board's rules suggest that the psychological sequela of a work-related physical injury should be considered when determining permanent impairment level, which we have described as the "overall level of work-incapacity" that resulted from an injury. *See Churchill v. Cent. Aroostook Ass'n for Retarded Citizens, Inc.*, 1999 ME 192, ¶ 11, 742 A.2d 475, 478.

### A. Permanent Impairment

[¶ 9] "Permanent impairment" is defined in our Workers' Compensation Act as "any anatomic or functional abnormality or loss existing after the date of maximum medical improvement that results from the injury." 39–A M.R.S. § 102(16) (2007). In prior versions of the Act, permanent

impairment benefits were awarded for loss of bodily function, pursuant to a schedule for impairment to individual body parts. *See, e.g.*, 39 M.R.S.A. § 56 (Pamph.1986). In 1987, this approach was replaced with the "whole-body" approach, in which permanent impairment was calculated as a percentage of total body impairment, and the number of weeks of benefits to be awarded was determined according to a sliding scale based on that percentage. P.L.1987, ch. 559, Pt. B, § 33 (codified at 39 M.R.S.A. § 56–B (1989)).

[¶ 10] The enactment of title 39–A in 1992 substantially altered the provisions governing permanent impairment benefits; benefits were no longer awarded for the impairment, either measured as a percentage of whole body impairment or measured by individual body parts. P.L.1991, ch. 885, § A–7 (effective January 1, 1993). The concept of permanent impairment remains in the Act, however, "as a rough measure of an employee's overall level of work-incapacity," *Churchill*, 1999 ME 192, ¶ 11, 742 A.2d at 478, and remains relevant when determining the length of time that an employee suffering partial incapacity is entitled to receive workers' compensation benefits. *See* 39–A M.R.S. § 213 (2007).[1]

■ [¶ 11] Section 213 and the Board's rules provide that benefits awarded to a person suffering from partial incapacity below the threshold level established by the Board, set at 11.8% for the 1999 injury at issue here, is capped at 312 weeks. *Id.*; Me. W.C.B. Rule, ch. 2, §§ 1, 2.[2] Employees suffering greater impairment are entitled to continue receiving partial incapacity benefits for the duration of their disability. 39–A M.R.S. § 213(1). The Act requires that the threshold be adjusted every two years so that 25% of employees suffering permanent impairment from their partially incapacitating injuries will receive benefits for the duration of their disability, while

---

1. Title 39–A M.R.S. § 213 (2007) provides, in relevant part:

    **1. Benefit and duration.** While the incapacity for work is partial, the employer shall pay the injured employee a weekly compensation equal to 80% of the difference between the injured employee's after-tax average weekly wage before the personal injury and the after-tax average weekly wage that the injured employee is able to earn after the injury, but not more than the maximum benefit under section 211. Compensation must be paid for the duration of the disability if the employee's permanent impairment, determined according to subsection 1–A and the impairment guidelines adopted by the board pursuant to section 153, subsection 8 resulting from the personal injury is in excess of 15% to the body. In all other cases an employee is not eligible to receive compensation under this section after the employee has received 260 weeks of compensation under section 212, subsection 1, this section or both. . . .

    . . . .

    **2. Threshold adjustment.** Effective January 1, 1998 and every other January 1st thereafter, the board, using an independent actuarial review based upon actuarially sound data and methodology, must adjust the 15% impairment threshold established in subsection 1 so that 25% of all cases with permanent impairment will be expected to exceed the threshold and 75% of all cases with permanent impairment will be expected to be less than the threshold.

    . . . .

    **4. Extension of 260–week limitation.** Effective January 1, 1998 and every January 1st thereafter, the 260–week limitation contained in subsection 1 must be extended 52 weeks for every year the board finds that the frequency of such cases involving the payment of benefits under section 212 or 213 is no greater than the national average based on frequency from the latest unit statistical plan aggregate data for Maine and on a countrywide basis, adjusted to a unified industry mix. The 260–week limitation contained in subsection 1 may not be extended under this subsection to more than 520 weeks.

2. Maine Workers' Compensation Board Rule, ch. 2, § 1(1) provides: "The permanent impairment threshold referenced in 39–A M.R.S. § 213(1) and (2) shall be reduced from 'in excess of 15%' to 11.8% or greater effective January 1, 1998."

    The Board has since changed the permanent impairment threshold for cases with dates of injury between 2002 and 2004 to 13.2%, for cases between 2004 and 2006, to 13.4%, and for cases with dates of injury after

75% will not. 39–A M.R.S. § 213(1), (2). The permanent impairment threshold in section 213 "reflects a legislative intent to preserve longer-term benefits for those employees with the most severe disabilities." *Churchill,* 1999 ME 192, ¶ 12, 742 A.2d at 479.

## B. The AMA *Guides* (4th ed.)

[¶ 12] In the discussion that follows, we conclude that because the AMA *Guides's* definition of permanent impairment "closely parallels" one that includes "any loss or abnormality of psychological ... function[,]" *see* AMA *Guides* at 1 (quotation marks omitted), the psychological sequela of a work-related physical injury may be included when determining permanent impairment. In addition, we conclude that the reason the AMA *Guides* did not adopt fixed percentages for psychological injuries is not because the AMA *Guides* views such injuries as not subject to assessment. Rather, fixed percentages were not adopted out of concern that precise measures would "likely ... be used inflexibly by adjudicators, who then are less likely to take into account the many factors that influence mental and behavioral impairment." AMA *Guides* at 301. The AMA *Guides* recognizes that there are circumstances in which it is "essential" for an examiner to estimate the degree of impairment associated with a psychological injury and, in such circumstances, using "the ordinal or numeric scale might be of some general use." *Id.*

[¶ 13] With the enactment of title 39–A, the Legislature mandated that the Board "establish by rule a schedule for determining the existence and degree of permanent impairment based upon medically or scientifically demonstrable findings." 39–A M.R.S. § 153(8)(A) (2007). The schedule was to be "based on generally accepted medical standards for determining impairment" and could "incorporate all or part of any one or more generally accepted schedules used for that purpose." *Id.* The purpose of the schedule is "to reduce litigation and establish more certainty and uniformity in the rating of permanent impairment." *Id.*

[¶ 14] Pursuant to section 153, the Board adopted the fourth edition of the AMA *Guides* for use in determining the level of permanent impairment.[3] Me. W.C.B. Rule, ch. 7, § 6. The rule provides:

Permanent impairment *shall be determined* after the effective date of this rule by use of the American Medical Association's "Guides to the Evaluation

---

January 1, 2006, to 11.8%. Me. W.C.B. Rule, ch. 2, § 1(2), (3), (4).

Pursuant to 39–A M.R.S. § 213(4), the 260-week limit was extended for an additional fifty-two weeks to 312 weeks for injuries occurring in 1999. Me. W.C.B. Rule, ch. 2, § 2(2).

**3.** Resolves 2005, ch. 53, §§ 1–3, directed the Workers' Compensation Board to consider adopting the fifth edition of the AMA *Guides,* and report its findings to the Legislature by January 15, 2006. In its report, the Board indicated that it was still considering whether to adopt the fifth edition, and that it would seek actuarial advice regarding whether the permanent impairment threshold should first be adjusted to keep the percentage of partially impaired claimants who exceed the threshold at 25%. Me. Workers' Compensation Board, Report to the Committee on Labor Pursuant to Resolve 2005, ch. 53 (Jan. 13, 2006).

In the fifth edition of the AMA *Guides,* numerical impairment ratings are not assigned, for the same reasons given in the fourth edition. American Medical Association, *Guides to the Evaluation of Permanent Impairment* 357, 361 (5th ed.2001). In the fifth edition, however, additional case examples are given to clarify how non-numerical impairment ratings should be assigned, and it is noted that "[s]ome states have chosen to assign numeric percentages to these categories." *Id.* at 358.

To date, the Board has not adopted the fifth edition, and a sixth edition was recently published, which, according to the employee, does assign percentages of impairment to psychiatric conditions.

of Permanent Impairment," 4th edition, copyright 1993.

(Emphasis added.)

[¶ 15] The fourth edition of the AMA *Guides* defines "impairment" and "permanent impairment" as follows:

Impairment is defined in the *Guides* as an alteration of an individual's health status. Impairment, according to the *Guides,* is assessed by medical means and is a medical issue. An impairment is a deviation from normal in a body part or organ system and its functioning. The *Guides* defines "permanent impairment" as one that has become static or stabilized during a period of time sufficient to allow optimal tissue repair, and one that is unlikely to change in spite of further medical or surgical therapy.

The *Guides* definition of an impairment closely parallels that of the World Health Organization (WHO), which has defined an impairment as "any loss or abnormality of psychological, physiological or anatomical structure or function."

AMA *Guides* at 1.

[¶ 16] "The major objective of the [AMA] *Guides* is to define the assessment and reporting of medical impairments so that physicians can collect, describe, and analyze information about impairments in accordance with a single set of standards." *Id.* at 7. Although rating impairments cannot be totally objective, "use of the *Guides* increases objectivity and enables physicians to evaluate and report medical impairment in a standardized manner, so that reports from different observers are more likely to be comparable in content and completeness." *Id.* at 5.

[¶ 17] The AMA *Guides* attempts to achieve objectivity and standardization by assigning percentages of impairment to different conditions based on specific measurements or assessments performed in a standardized manner. *See id.* at 5, 7. However, the AMA *Guides* explicitly cau-

tions that it "does not and cannot provide answers about every type and degree of impairment." *Id.* at 3. It is a guideline to be used in conjunction with the expertise of the medical profession. *See id.*

[¶ 18] There are no numerical percentages assigned by the AMA *Guides* to mental and behavioral disorders not caused by a neurological condition. *Id.* ch. 14. The editors of the fourth edition explain their decision not to establish numerical percentages for non-neurologic mental impairments as follows:

[U]nlike the situations with some organ systems, there are no precise measures of impairment in mental disorders. The use of percentages implies a certainty that does not exist, and the percentages are likely to be used inflexibly by adjudicators, who then are less likely to take into account the many factors that influence mental and behavioral impairment. Also, because no data exist that show the reliability of the impairment percentages, it would be difficult for *Guides* users to defend their use in administrative hearings.

*Id.* at 301.

[¶ 19] The AMA *Guides* sets forth a method of evaluating mental impairment at section 14.7. *Id.* at 300–02. Four categories of functional limitations are identified: (1) activities of daily living; (2) social functioning; (3) concentration; and (4) adaptation. *Id.* The physician is directed to inquire into and record observations about these categories during the examination. *Id.* A table serves as a guideline for rating mental impairment in each of the four areas of functional limitation on a five-category scale: "none," meaning no impairment; "mild," meaning impairment compatible with most useful functioning; "moderate," meaning impairment compatible with some but not all useful functioning; "marked," meaning impairment that

significantly impedes useful functioning; or "extreme," meaning impairment not compatible with useful functioning. *Id.* at 301.

[¶ 20] Chapter fourteen cautions that "[t]ranslating these guidelines for rating individual impairment on ordinal scales into a method for assigning percentages of impairments, as if valid estimates could be made on precisely measured interval scales, cannot be done reliably." *Id.* However, it also acknowledges that when it is essential to make an estimate, doctors must attempt to do so as accurately as possible using their best clinical judgment:

> Physicians, of course, must often make judgments based more on clinical impressions than on accurate, objective, analytic empiric evidence. In those circumstances in which it is essential to make an estimate, the ordinal or numeric scale might be of some general use....
>
> Eventually, research may disclose direct relationships between medical findings and percentages of mental impairment. Until that time, the medical profession must refine its concepts of mental impairment, improve its ability to measure limitations, and continue to make clinical judgments.

*Id.*

[¶ 21] Because duration of disability benefits under Maine's Act are premised on the determination of a threshold numerical level of impairment, *see* 39–A M.R.S. § 213, it is essential for an evaluator to make a numeric estimate of the degree of impairment if the evaluator determines that an employee who has suffered a work-related physical injury has, as a consequence, also suffered a loss or abnormality of psychological function that has reached a level of maximum medical improvement.

## C. The IME's Opinion and Hearing Officer's Decision

[¶ 22] Dr. Lobozzo diagnosed Harvey as suffering from "major depressive disorder, single episode, mild to moderate severity, without psychosis," related to the 1999 work injury. He also diagnosed a "pain disorder, associated with both psychological factors and a general medical condition." He concluded that she suffers 7% permanent impairment as a result of her psychological condition, based on Table 3 in chapter four of the fourth edition of the AMA *Guides.* He explained the 7% rating as follows:

> She has mild impairment in [activities of daily living]. She is able to take care of herself and her personal hygiene. She is able to communicate. Physical activity is somewhat restricted. Sensory function is intact and she is able to travel. Sexual function and sleep are impaired but some of this impairment could be related to her pain. Therefore, she is classified as Class 2, mild impairment, referring to page 142 of the Fourth Edition of the Guides. This method of using the Guides is one of the methods suggested by Arthur Myerson, MD, an author of the Guides. Class 2 impairment is in the 0–14% range and my standard procedure is to take the mean, which in this case would be 7% permanent impairment as a result of psychiatric problems.

[¶ 23] The hearing officer adopted Dr. Lobozzo's opinion that Harvey suffers 7% permanent impairment as a result of depression. He reasoned that the fourth edition of the AMA *Guides* does "not preclude using numerical percentages when such is required," noting that the AMA *Guides* contains language that allows for physicians to assess a percentage of impairment when it is necessary to do so,

based on clinical impressions and judgment.

■ [¶ 24] On questions involving the interpretation and application of Workers' Compensation Act or Board regulations, we defer to the Workers' Compensation Board hearing officer unless the statute or regulations plainly compel a contrary result. *Jordan v. Sears, Roebuck & Co.*, 651 A.2d 358, 360 (Me.1994); *see also Jasch v. The Anchorage Inn*, 2002 ME 106, ¶ 10, 799 A.2d 1216, 1218–19. The hearing officer's factual findings are final, 39–A M.R.S. § 318 (2007), and not subject to appeal, M.R.App. P. 23(b)(3).

■ [¶ 25] H.C. Price contends that the hearing officer erred when adopting the IME's opinion of 7% permanent impairment for depression, because the statute and Board rules require that permanent impairment ratings be established only pursuant to the fourth edition of the AMA *Guides*, and that edition does not delineate numerical percentages of impairment for non-neurological mental disorders. It argues that assigning such a value without having specific percentages allocated in the AMA *Guides* defeats the Board's purpose in adopting the *Guides*, which is to standardize permanent impairment values for the same conditions. H.C. Price further contends that it was error to rate Harvey's impairment for depression based on the percentages assigned to neurological emotional and behavioral impairments in chapter four, when it is undisputed that Harvey's condition falls within the purview of chapter fourteen, which governs impairment from non-neurological mental and behavioral disorders, including depression. We find H.C. Price's arguments unpersuasive.

[¶ 26] The definitions of permanent impairment in the fourth edition of the AMA *Guides* and in the Maine Workers' Compensation Act are broad enough to encompass mental as well as physical impairment resulting from work injuries. The statute's definition includes "*any* anatomic or functional abnormality or loss." 39–A M.R.S. § 102(16) (emphasis added). The fourth edition states that its definition of impairment closely parallels that of the World Health Organization, which has defined impairment as "any loss or abnormality of psychological, physiological or anatomical structure or function." AMA *Guides* at 1. While the AMA *Guides* does not assign standard numerical percentages of impairment for mental illness, it does not *prohibit* assigning a numerical percentage based on an individualized medical evaluation. It is evident that the editors of the fourth edition were reluctant to dictate standardized percentages for specific mental conditions because there are many variables that influence how a particular mental condition affects each individual's health status.

■ [¶ 27] Having concluded that the fourth edition of the AMA *Guides* does not bar assignment of a numerical percentage to permanent mental impairment, we must next decide whether it was error to base the 7% impairment rating on an IME opinion formulated with reference to a table found in chapter four of the AMA *Guides*. Chapter four assigns percentages of impairment to emotional and behavioral impairment that results from neurological conditions. In this case, there is no evidence that Harvey suffers from a neurological condition.[4]

---

4. At his deposition, Dr. Lobozzo testified that although depression is not a neurological impairment and that Harvey does not suffer from a brain or spinal cord injury, he considers the mind and body to be interrelated and noted that mental and behavioral disorders such as depression can cause physical changes in the brain resulting from the release of neurotransmitters.

[¶ 28]   The table used by the IME, entitled "Table 3. Emotional or Behavioral Impairments," contains numeric percentages of impairment for neurologic conditions that have psychiatric features, including depression.  Chapter four expressly states that the criteria for evaluating these impairments relate to the criteria for evaluating mental and behavior impairments in chapter fourteen.  *Id.* at 141–42.  In addition, Board rules require that permanent impairment be determined by use of the fourth edition of the AMA *Guides*.  Me. W.C.B. Rule, ch. 7, § 6.  Thus, we do not find error in the IME's use of the emotional or behavioral impairments table in chapter four to rate impairment related to Harvey's depression because that method is not inconsistent with the Act or Board rules, and Table 3 in chapter four represents a fair analogue to the impairment classifications described, but not rated, in chapter fourteen.  Thus, the hearing officer adopted an impairment opinion that was formulated using a rational method, circumscribed within the fourth edition of the AMA *Guides*.

■ . [¶ 29]   H.C. Price also argues that it was error to adopt Dr. Lobozzo's opinion because instead of making an individualized assessment of the precise numerical percentage of impairment, he followed his practice of adopting the mean percentage within the applicable range.  That is, he determined Harvey suffered from mild impairment pursuant to chapter fourteen, which corresponds with the mild impairment category in Table 3 from chapter four, which assigns a range of possible impairment from 0 to 14%.  He then assigned the mean within that category, or 7%. He testified that in certain cases he has deviated from the mean, but generally, "moving from that mean is—implying an accuracy that really doesn't exist."

[¶ 30]   It is apparent from Dr. Lobozzo's report that he made an individualized assessment of Harvey's condition.  His method of establishing the precise percentage of impairment does not violate any particular statute or rule, but is instead a product of his medical training, clinical judgment, and application of the AMA *Guides*.  We therefore find no error in the hearing officer's adoption of the rating.  *See* AMA *Guides* at 1 ("Impairment, according to the *Guides*, is assessed by medical means and is a medical issue.").[5]

[¶ 31]   Finding no error in the hearing officer's reliance on the IME's opinion assigning a numerical percentage to work-related, permanent mental impairment, we affirm.

The entry is:

5.  H.C. Price also contends that it was error for the IME to rate Harvey's permanent impairment for depression because Harvey had not yet reached maximum medical improvement.  " 'Maximum medical improvement' means the date after which further recovery and further restoration of function can no longer be reasonably anticipated, based upon reasonable medical probability."  39–A M.R.S. § 102(15) (2007).

In his report, Dr. Lobozzo did not expressly state his opinion on whether Harvey had reached maximum medical improvement.  In his deposition, however, he opined that she had reached maximum medical improvement, and even though her medication had recently been changed, further improvement in her condition was unlikely.  The hearing officer implicitly adopted this factual finding, and we do not disturb it.

The decision of the hearing officer of the Workers' Compensation Board is affirmed.