2008 ME 162

**David J. SPRAGUE**

**v.**

**LUCAS TREE EXPERTS et al.**

Supreme Judicial Court of Maine.

Argued: June 17, 2008.

Decided: Oct. 21, 2008.

Robert J. Piampiano, Esq., Brenda T. Piampiano, Esq. (orally), Piampiano Law Offices, Yarmouth, ME, for Lucas Tree Experts.

Kevin M. Noonan, Esq. (orally), McTeague Higbee Case Cohen Whitney & Toker, Topsham, ME, for David J. Sprague.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

LEVY, J.

[¶ 1] Lucas Tree Experts appeals from a decision of a Workers' Compensation Board hearing officer (*Sprague, HO*) determining that David J. Sprague suffers from 12% permanent impairment as a result of a work injury to his lower back. Lucas contends that pursuant to the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993) (AMA *Guides*), it was error for the hearing officer to establish the permanent impairment rating based on a medical opinion formulated using the "Range of Motion" model rather than the "Injury" or "Diagnostic Related Estimate" model. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

[¶ 2] David Sprague injured his back in 1999 while working as a foreman for Lucas. He suffered a herniated disk at L4–5. After attempts at more conservative treatment, he underwent a diskectomy and laminectomy in 1999. In 2003, an additional herniation was found at L5–S1, and he underwent a second surgical procedure. Despite the surgeries, he continues to suffer residual lower back pain and sharp, shooting pain in his right leg. He was able to perform light duty work on and off for Lucas until he was laid off in 2003.

[¶ 3] In a prior decree, the hearing officer determined that Sprague suffers partial incapacity and awarded him ongoing benefits. Lucas filed a petition for review and to determine the extent of Sprague's permanent impairment. Lucas contended that Sprague's level of permanent impairment did not exceed the 11.8% threshold level established by statute and rule, and that he had received all benefits to which he was entitled. A permanent impairment rating above 11.8% would entitle Sprague to receive partial benefits for the duration of his incapacity. 39–A M.R.S. § 213(1) (2007); Me. W.C.B. Rule, ch. 2, § 1(1).

[¶ 4] The Board's rules require evaluators to use the fourth edition of the AMA *Guides* to assess the injured employee's permanent impairment level. Me. W.C.B. Rule, ch. 7, § 6. It is Lucas's position that the AMA *Guides* requires that evaluators use the "Diagnostic Related Estimates" (DRE) model to assess permanent impairment to the spine. Dr. Bamberger was

appointed as the independent medical examiner (IME) pursuant to 39–A M.R.S. § 312 (2007). Dr. Bamberger used the alternative "Range of Motion" (ROM) model to determine that Sprague suffers 12% permanent impairment. The record contains two additional medical opinions on Sprague's permanent impairment level. Dr. Pier, Sprague's treating physician, used the DRE model and concluded that Sprague suffers 10% permanent impairment. Although a third opinion, from Dr. Brigham, is consistent with Dr. Pier's assessment of 10%, it was disregarded by the hearing officer because it had not been considered by the IME. *See* 39–A M.R.S. § 312(7). Finding no clear and convincing evidence to contradict the IME's opinion, the hearing officer concluded that Sprague suffers 12% permanent impairment.[1]

[¶ 5] Lucas filed a motion for additional findings of fact and conclusions of law, which the hearing officer denied. Lucas then filed a petition for appellate review, which we granted pursuant to 39–A M.R.S. § 322 (2007) and M.R.App. P. 23.

## II. DISCUSSION

[¶ 6] The questions presented in this appeal are whether the hearing officer was compelled to reject the IME's opinion because (1) it was formulated in a manner inconsistent with the AMA *Guides,* or (2) there was clear and convincing contradictory evidence in the record. Specifically, Lucas contends that because the AMA *Guides* mandates use of the DRE method when measuring impairment from spinal injuries, the hearing officer was required to reject the IME opinion formulated us-

ing the ROM method. Lucas further contends that other medical evidence, coupled with the fact that the IME deviated from statutory and regulatory guidelines, constitutes sufficient clear and convincing evidence to require rejection of the IME's medical findings pursuant to 39–A M.R.S. § 312(7).

[¶ 7] We address these questions by examining our statutes and rules related to the assessment of permanent impairment, the AMA *Guides,* our statute governing independent medical examiners, the IME's opinion, and the hearing officer's decision adopting that opinion. We conclude that (1) the hearing officer did not err in adopting the IME's opinion because the fourth edition of the AMA *Guides* gives the evaluator discretion to use the ROM model to assess permanent spinal impairment when the evaluator concludes that the employee's injury does not fit within the categories of the DRE or injury model; and (2) the hearing officer was not compelled to reject the IME's opinion based on clear and convincing evidence in the record.

### A. Permanent Impairment

[¶ 8] "Permanent impairment" is defined in our Workers' Compensation Act as "any anatomic or functional abnormality or loss existing after the date of maximum medical improvement that results from the injury." 39–A M.R.S. § 102(16) (2007). The concept of permanent impairment has had different significance in our workers' compensation system at various times as the Act has been amended by the Legislature. *See Harvey v. H.C. Price Co.,* 2008

---

1. Title 39–A M.R.S. § 312(7) (2007) provides: The board shall adopt the medical findings of the independent medical examiner unless there is clear and convincing evidence to the contrary in the record that does not support the medical findings. Contrary evidence does not include medical evidence not considered by the independent medical

examiner. The board shall state in writing the reasons for not accepting the medical findings of the independent medical examiner.

As such, Dr. Bamberger's medical findings were entitled to conclusive weight absent clear and convincing evidence to the contrary.

ME 161, ¶¶ 9, 10, 957 A.2d 960, 962–63, 2008 WL 4683643. It remains in the Act today "as a rough measure of an employee's overall level of work-incapacity," *Churchill v. Central Aroostook Ass'n for Retarded Citizens, Inc.*, 1999 ME 192, ¶ 11, 742 A.2d 475, 478, and is relevant when determining the length of time that an employee suffering partial incapacity is entitled to receive workers' compensation benefits, *see* 39–A M.R.S. § 213.[2]

[¶ 9] Section 213(1) and the Board's rules provide that benefits awarded to a person suffering from partial incapacity below the threshold level established by the Board, set at 11.8% for the 1999 injury

at issue here, are capped at the maximum number of weeks established by statute and rule. *Id.*; Me. W.C.B. Rule, ch. 2, §§ 1, 2.[3] Employees suffering greater impairment are entitled to continue receiving partial incapacity benefits for the duration of their disability. 39–A M.R.S. § 213(1).

**B. The Fourth Edition of the AMA Guides**

[¶ 10] As we noted in *Harvey*, with the enactment of title 39–A, the Legislature mandated that the Board "establish by rule a schedule for determining the existence and degree of permanent impairment based upon medically or scientifically demonstrable findings." 39–A M.R.S.

2. Title 39–A M.R.S. § 213 (2007) provides, in relevant part:

> **1. Benefit and duration.** While the incapacity for work is partial, the employer shall pay the injured employee a weekly compensation equal to 80% of the difference between the injured employee's after-tax average weekly wage before the personal injury and the after-tax average weekly wage that the injured employee is able to earn after the injury, but not more than the maximum benefit under section 211. Compensation must be paid for the duration of the disability if the employee's permanent impairment, determined according to subsection 1–A and the impairment guidelines adopted by the board pursuant to section 153, subsection 8 resulting from the personal injury is in excess of 15% to the body. In all other cases an employee is not eligible to receive compensation under this section after the employee has received 260 weeks of compensation under section 212, subsection 1, this section or both....
>
> . . . .
>
> **2. Threshold adjustment.** Effective January 1, 1998 and every other January 1st thereafter, the board, using an independent actuarial review based upon actuarially sound data and methodology, must adjust the 15% impairment threshold established in subsection 1 so that 25% of all cases with permanent impairment will be expected to exceed the threshold and 75% of all cases

> with permanent impairment will be expected to be less than the threshold....
>
> . . . .
>
> **4. Extension of 260–week limitation.** Effective January 1, 1998 and every January 1st thereafter, the 260–week limitation contained in subsection 1 must be extended 52 weeks for every year the board finds that the frequency of such cases involving the payment of benefits under section 212 or 213 is no greater than the national average based on frequency from the latest unit statistical plan aggregate data for Maine and on a countrywide basis, adjusted to a unified industry mix. The 260–week limitation contained in subsection 1 may not be extended under this subsection to more than 520 weeks.

3. Maine W.C.B. Rule, ch. 2, § 1(1) provides: "The permanent impairment threshold referenced in 39–A M.R.S.A. §§ 213(1) and (2) shall be reduced from 'in excess of 15%' to 11.8% or greater effective January 1, 1998."

The Board has since changed the permanent impairment threshold for cases with dates of injury between 2002 and 2004 to 13.2%, for cases between 2004 and 2006, to 13.4%, and for cases with dates of injury after January 1, 2006, to 11.8%. Me. W.C.B. Rule, ch. 2, § 1(2), (3), (4).

Pursuant to 39–A M.R.S. § 213(4), the Board extended the 260–week limit by fifty-two weeks on January 1, 1999, January 1, 2000, and January 1, 2007. Me. W.C.B. Rule, ch. 2, § 2(2), (3), (7).

§ 153(8)(A) (2007); *see also Harvey*, 2008 ME 161, ¶ 13, 957 A.2d at 964. The schedule was to be "based on generally accepted medical standards for determining impairment" and could "incorporate all or part of any one or more generally accepted schedules used for that purpose." 39–A M.R.S. § 153(8)(A). The purpose of the schedule is "to reduce litigation and establish more certainty and uniformity in the rating of permanent impairment." *Id.*

[¶ 11] Pursuant to section 153, the Board adopted the fourth edition of the AMA *Guides* for use in determining the level of permanent impairment. Me. W.C.B. Rule, ch. 7, § 6. The fourth edition of the AMA *Guides* defines "impairment" and "permanent impairment" as follows:

> Impairment is defined in the *Guides* as an alteration of an individual's health status. Impairment, according to the *Guides*, is assessed by medical means and is a medical issue. An impairment is a deviation from normal in a body part or organ system and its functioning. The *Guides* defines "permanent impairment" as one that has become static or stabilized during a period of time sufficient to allow optimal tissue repair, and one that is unlikely to change in spite of further medical or surgical therapy.

AMA *Guides* at 1.

[¶ 12] "The major objective of the *Guides* is to define the assessment and reporting of medical impairments so that physicians can collect, describe, and analyze information about impairments in accordance with a single set of standards." *Id.* at 7. Although rating "impairments cannot be totally objective, use of the *Guides* increases objectivity and enables physicians to evaluate and report medical impairment in a standardized manner, so that reports from different observers are more likely to be comparable in content and completeness." *Id.* at 5.

[¶ 13] The AMA *Guides* attempts to achieve objectivity and standardization by assigning percentages of impairment to different conditions based on specific measurements or assessments performed in a standardized manner. *See id.* at 5, 7. However, the AMA *Guides* explicitly cautions that it "does not and cannot provide answers about every type and degree of impairment." *Id.* at 3. It is a guideline to be used in conjunction with the expertise of the medical profession. *See id.*

[¶ 14] Chapter three of the AMA *Guides* governs the evaluation of permanent impairment to the musculoskeletal system, including the spine. The introductory section states:

> Examinations for determining musculoskeletal system impairments are based on traditional approaches for recording the medical history and performing the physical examination. The impairment examination and report should *not* be separated from the generally accepted principles of medical practice or the consensus of medical knowledge and experience.
>
> The measurement techniques *recommended* in this chapter are current and are as simple, practical, and scientifically sound as possible. The tests should be done accurately and precisely.
>
> . . . .
>
> The recommended tests should be performed and reported according to *Guides* recommendations, so they can be repeated by others and the results compared.

*Id.* at 13, 14 (emphasis added).

[¶ 15] When rating permanent impairment attributable to spinal injuries, evaluators are directed to follow one of two approaches, the DRE or "Injury" model, or the ROM model, as follows:

In this edition of the *Guides,* the contributors have elected to use two approaches. One component, which applies especially to patients' traumatic injuries, is called the "Injury Model." This part involves assigning a patient to one of eight categories, such as a minor injury, radiculopathy, loss of spine structure integrity, or paraplegia, on the basis of objective clinical findings. The other component is the "Range of Motion Model," described above and recommended in previous *Guides* editions.

. . . .

*The evaluator assessing the spine should use the Injury Model, if the patient's condition is one of those listed in Table 70 (p. 108). That model, for instance, would be applicable to a patient with a herniated lumbar disk and evidence of nerve root irritation. If none of the eight categories of the Injury Model is applicable, then the evaluator should use the Range of Motion Model.*

All persons evaluating impairments according to *Guides* criteria are cautioned that either one *or* the other approach should be used in making the final impairment estimate. If one component were used according to *Guides* recommendations, then a final impairment estimate using the other component usually would not be pertinent or germane. *However, if disagreement exists about the category of the Injury Model in which a patient's impairment belongs, then the Range of Motion Model may be applied to provide evidence on the question.*

*Id.* at 94 (emphasis added). The AMA Guides states that the Injury model should be used even if the patient has undergone surgery: "With the Injury Model, surgery to treat an impairment does not modify the original impairment estimate, which remains the same in spite of any changes in signs or symptoms that may follow the surgery and irrespective of whether the patient has a favorable or unfavorable response to treatment." *Id.* at 100.[4]

[¶ 16] The AMA *Guides* does state: "If the Injury Model is not applicable, refer to and use the Range of Motion Model," and, "[i]f the physician cannot place the patient into an impairment category, or if disagreement exists about which of two or three categories to use for the patient, the physician should use the Range of Motion Model as a differentiator." *Id.* at 101. That is, the ROM model could be used to "decide placement within one of the DRE categories." *Id.* at 99.

### C. The IME's Opinion and the Hearing Officer's Decision

[¶ 17] In his deposition, the IME conceded that Sprague's condition placed him in DRE lumbosacral category III: Radiculopathy, from Table 70, and that pursuant to the DRE model, he would be assigned a 10% impairment rating. He testified that he did not use that model, and instead opted for the ROM model and Table 75, because that model allows for an additional 2% impairment when the patient has undergone multiple back surgeries. In his opinion the DRE categories do not take into account the potential functional re-

---

**4.** The editors of the fourth edition rejected the primary use of the range of motion model because: (1) when applying it, other clinical data and diagnostic information tend to be ignored; (2) some physicians have concerns about accuracy and reproducibility of measurements; (3) it may fail to account for the effects of aging; and (4) measurements taken with an inclinometer, the tool used to measure range of motion in the back, are more difficult to get accurately than those taken with a hinged goniometer, used to measure range of motion of the extremities. American Medical Association, *Guides to the Evaluation of Permanent Impairment* 94 (4th ed. 1993).

sults of surgery and neither DRE category III (radiculopathy—10% impairment) nor category IV (loss of motion segment integrity—15% impairment) from Table 70 accurately reflect Sprague's condition, which Dr. Bamberger thought was in between the two categories. Dr. Bamberger interpreted the AMA *Guides* as allowing for use of the evaluator's medical judgment in such circumstances.

[¶ 18] The hearing officer adopted the IME's opinion of 12%, rejecting Lucas's argument that the IME's opinion should not be adopted because it is inconsistent with the AMA *Guides*. He reasoned that the AMA *Guides* is designed to be used by qualified doctors, and allows them to use clinical skill, knowledge, and judgment in making assessments. The hearing officer accepted Dr. Bamberger's reason for using the ROM method as appropriate based on his medical expertise and skill, and declined to substitute his judgment for that of the IME.

D. Analysis

■ [¶ 19] On questions involving the interpretation and application of Workers' Compensation Board regulations, we give deference to the Board unless the statutes or regulations plainly compel a contrary result. *Jordan v. Sears, Roebuck & Co.*, 651 A.2d 358, 360 (Me.1994); *see also Jasch v. The Anchorage Inn*, 2002 ME 106, ¶ 10, 799 A.2d 1216, 1218–19. The hearing officer's factual findings are final and not subject to appeal. 39-A M.R.S. § 318 (2007); M.R.App. P. 23(b)(3).

1. AMA *Guides*

■ [¶ 20] Lucas contends that because our statutes and the Board's rules specifically require use of the fourth edition of the AMA *Guides* when determining permanent impairment and chapter three of the AMA *Guides* specifically requires use of the DRE/injury model when the employee's medical condition is one of those listed in Table 70, it was error for Dr. Bamberger, the IME, to adopt a permanent impairment rating based on the ROM model. Lucas also contends that even if Dr. Bamberger found that Sprague did not fit within a DRE category, he should have used the ROM model to place Lucas in the proper category, not as an assessment tool in and of itself. Lucas further asserts that there is no support in the AMA *Guides* for increasing impairment due to multiple surgeries.

[¶ 21] In essence, Lucas asks us to conclude that Sprague's medical condition falls so squarely into a particular category of the DRE model as to compel us to vacate the hearing officer's decision that rated Sprague's permanent impairment at a level derived from the ROM model. However, we do not find the issue to be as straightforward as Lucas urges. The statute merely requires the Board to adopt a schedule for determining permanent impairment, and the Board's rules require use of the fourth edition of the AMA *Guides* as that schedule. The AMA *Guides*, although aiming for consistency and reproducibility of results, recognize that absolute consistency is not achievable. "Impairment, according to the *Guides*, is assessed by medical means and is a medical issue." AMA *Guides* at 1.

[¶ 22] The AMA *Guides* allows for use of the ROM model in some circumstances. The independent medical examiner concluded, based on his medical training and professional judgment, that the employee's permanent impairment should be measured using the ROM model. This approach violated neither the letter nor the spirit of the AMA *Guides*. *See Harvey*, ¶ 30, 957 A.2d at 968. The statute and the Board's rules do not plainly compel a different result.

### 2. Title 39–A M.R.S. § 312(7)

[¶ 23] Lucas also asserts that clear and convincing evidence in the record compelled the hearing officer to reject the IME's opinion, pursuant to 39–A M.R.S. § 312(7). Section 312(7) provides:

> The board shall adopt the medical findings of the independent medical examiner unless there is clear and convincing evidence to the contrary in the record that does not support the medical findings. Contrary evidence does not include medical evidence not considered by the independent medical examiner. The board shall state in writing the reasons for not accepting the medical findings of the independent medical examiner.

[¶ 24] On appeal from a hearing officer's medical findings when the standard of proof is clear and convincing evidence, we:

> look to whether the hearing officer could reasonably have been persuaded that the required factual finding was or was not proved to be highly probable. For purposes of section 312, this means that we determine whether the hearing officer could have been reasonably persuaded by the contrary medical evidence that it was highly probable that the record did not support the IME's medical findings.

*Dubois v. Madison Paper Co.*, 2002 ME 1, ¶ 14, 795 A.2d 696, 699–700 (citation and quotation marks omitted).

[¶ 25] Lucas argues that Dr. Pier's opinion of 10% impairment based on the DRE model constitutes clear and convincing evidence to the contrary because it is based on the method of assessment prescribed by the AMA *Guides* and is of equal value as a medical opinion to that of Dr. Bamberger. Lucas also asserts that Dr. Brigham's opinion, which was not considered by the hearing officer as contrary evidence because it was not considered by the IME, is consistent with Dr. Pier's assessment.[5] Finally, Lucas asserts that Dr. Bamberger's deviation from the AMA *Guides* in and of itself constitutes clear and convincing evidence mandating rejection of the "deviating opinion."

[¶ 26] We have already concluded that the hearing officer committed no legal error in adopting the IME's opinion in this case on the ground that it deviates from the AMA *Guides*. We are not persuaded that the hearing officer's decision should be vacated on the ground that other medical evidence in the record was so clear and convincing as to *require* us to conclude that it was highly probable that the IME's medical findings were not supported by the record. Furthermore, it was appropriate for the hearing officer to disregard Dr. Brigham's report pursuant to section 312(7) because it had not been provided to the IME.

[¶ 27] Accordingly, while the hearing officer *could* have been persuaded that other medical findings in the record were highly probable, he was not bound to reject the IME opinion on that basis.

The entry is:

Decision affirmed.

---

5. Lucas contends that Dr. Brigham's opinion, although not submitted to the IME, should have been considered by the hearing officer to the extent that it gave an opinion on the methodology required by the AMA *Guides* in assessing spinal injuries, as opposed to the medical findings. We disagree. It was proper for the hearing officer to disregard Dr. Brigham's report on the basis that it had not been provided to the IME. 39–A M.R.S. § 312(7); *Higgins v. H.P. Hood, Inc.*, 2007 ME 94, ¶ 12, 926 A.2d 1176, 1179.