2008 ME 172

**Arnold SMART**

v.

**DEPARTMENT OF PUBLIC SAFETY.**

Supreme Judicial Court of Maine.

Argued: Sept. 11, 2007.
Decided: Nov. 20, 2008.

Paul H. Sighinolfi, Esq. (orally), Debra A. Reece, Esq., Rudman & Winchell, LLC, Bangor, ME, for the Department of Public Safety.

Norman G. Trask, Esq. (orally), Currier & Trask, P.A., Presque Isle, ME, for Arnold Smart.

James J. MacAdam, Esq., Anna Priluck, Esq., Nathan A. Jury, Esq., MacAdam Law Offices, P.A., Portland, ME, for amici curiae United Steelworkers of America; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO Local # 29; United Association of Plumbers & Pipefitters; and International Association of Bridge, Structural, Ornamental, and Re-inforcing Iron Workers Local 7.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, and MEAD, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, and MEAD, JJ.

Dissent: SILVER, J.

LEVY, J.

[¶ 1]   The Department of Public Safety appeals from a decision of a Workers' Compensation Board hearing officer (*Sprague, HO*) denying its petition for review and assigning a permanent impairment rating of 40% to Arnold Smart for a 1996 mental stress injury resulting from work-related mental stress.   The Department contends that it was error to assign a permanent impairment rating to Smart's injury based on the lack of specific numerical ratings for mental and behavioral conditions in the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993) (AMA *Guides*), which is required for use when establishing a permanent impairment level.   We conclude that the hearing officer was authorized to assign a numerical impairment rating to the mental stress injury, but that the hearing officer erred by adopting an independent medical examiner's opinion that was arrived at in a manner inconsistent with the fourth edition of the AMA *Guides*.   Accordingly, we vacate the decision and remand for further proceedings.

## I.   FACTUAL BACKGROUND

[¶ 2]   Arnold Smart is a former State Trooper, assigned to work out of Fort Kent.   He suffered a mental stress injury in the course of his employment and was

diagnosed as suffering from depression and a pre-existing obsessive-compulsive disorder that was aggravated by his employment situation. In a 1998 decree, a hearing officer determined Smart suffered a compensable mental stress injury pursuant to 39–A M.R.S. § 201(3) (2007),[1] and awarded him ongoing partial (70%) incapacity benefits.

[¶ 3] In the current proceeding, the Department filed a petition for review asserting that Smart's permanent impairment level does not exceed the statutory threshold for continuing partial incapacity benefits beyond the maximum number of weeks allowed, and that it should be permitted to discontinue benefits.[2] *See* 39–A M.R.S. § 213(1) (2007); Me. W.C.B. Rule, ch. 2. The Department took the position that because the AMA *Guides* does not assign specific numerical percentages of permanent impairment for psychological conditions, the hearing officer could not assign any percentage of impairment to Smart's condition.

[¶ 4] Smart underwent an examination by an independent medical examiner (IME) pursuant to 39–A M.R.S. § 312 (2007).[3] The IME opined that Smart suffers from major depressive disorder, anxiety disorder, and obsessive-compulsive personality disorder. The IME concluded that Smart has moderate to severe impairment as a result of these conditions, and established his permanent impairment rating at 40–45%.

[¶ 5] The hearing officer concluded that while Smart has some capacity for work and can function relatively well performing the activities of daily living, "he is unable to function fully in the work place. He has had severe problems mentally for the last ten years [and] has not improved." The hearing officer concluded that the fourth edition of the AMA Guides allows for mental stress injuries to be numerically rated and, finding no clear and convincing evidence to contradict the IME's opinion, determined that Smart suffers 40% whole person permanent impairment.

1. Mental stress injuries are compensable pursuant to 39–A M.R.S. § 201(3) (2007), which provides:

   **3. Mental injury caused by mental stress.** Mental injury resulting from work-related stress does not arise out of and in the course of employment unless it is demonstrated by clear and convincing evidence that:
   A. The work stress was extraordinary and unusual in comparison to pressures and tensions experienced by the average employee; and
   B. The work stress, and not some other source of stress, was the predominant cause of the mental injury.
   The amount of work stress must be measured by objective standards and actual events rather than any misperceptions by the employee.
   A mental injury is not considered to arise out of and in the course of employment if it results from any disciplinary action, work evaluation, job transfer, layoff, demotion, termination or any similar action, taken in good faith by the employer.

2. Partial benefits paid for a 1996 injury, when an employee suffers whole person permanent impairment of less than 15%, are capped at 260 weeks. Injured employees with greater impairment can receive partial benefits for the duration of the incapacity. 39–A M.R.S. § 213(1) (2007); Me. W.C.B. Rule, ch. 2, §§ 1, 2.

3. Title 39–A M.R.S. § 312(7) (2007) provides:

   **7. Weight.** The board shall adopt the medical findings of the independent medical examiner unless there is clear and convincing evidence to the contrary in the record that does not support the medical findings. Contrary evidence does not include medical evidence not considered by the independent medical examiner. The board shall state in writing the reasons for not accepting the medical findings of the independent medical examiner.

[¶ 6]   The Department filed a request for additional findings of fact and conclusions of law, which the hearing officer denied.  We granted its petition for appellate review pursuant to 39–A M.R.S. § 322 (2007) and M.R.App. P. 23(c).

## II.   DISCUSSION

### A.   Numerical Impairment Rating for a Mental Stress Injury

■ [¶ 7]   We noted in our recent decision in *Harvey v. H.C. Price Co.*, 2008 ME 161, ¶ 7, 957 A.2d 960, that the Workers' Compensation Act has long recognized the compensability of mental stress work injuries, as well as the mental sequelae of physical work injuries.  *See also* 39–A M.R.S. § 201(3); *Townsend v. Me. Bur. of Pub. Safety*, 404 A.2d 1014, 1016–17 (Me. 1979); *Cote v. Osteopathic Hosp. of Me., Inc.*, 447 A.2d 75, 78 (Me.1982).  At issue in this case, as in *Harvey*, is whether the hearing officer erred by assigning a percentage of permanent impairment resulting from an employee's psychological work injury when the AMA *Guides* does not assign numerical percentages to non-neurological mental impairments.

[¶ 8]   In *Harvey* we reviewed the provisions of the Workers' Compensation Act and Workers' Compensation Board Rules [4] pertaining to permanent impairment, as well as the relevant provision of the AMA *Guides*, and we concluded that none of those authorities prohibit the assignment of a numerical percentage of impairment to the mental sequela of a physical injury. 2008 ME 161, ¶ 26, 957 A.2d at 967.  We reasoned as follows:

---

4.   Me. W.C.B. Rule, ch. 7, § 6(2) requires use of the fourth edition of the AMA *Guides* when evaluating permanent impairment.  The rule provides:

The definitions of permanent impairment in the fourth edition of the AMA *Guides* and in the Maine Workers' Compensation Act are broad enough to encompass mental as well as physical impairment resulting from work injuries.   The statute's definition includes "*any* anatomic or functional abnormality or loss."   39–A M.R.S. § 102(16) [(2007)] (emphasis added).  The fourth edition states that its definition of impairment closely parallels that of the World Health Organization, which has defined impairment as "any loss or abnormality of psychological, physiological or anatomical structure or function."  AMA *Guides* at 1.  While the AMA *Guides* does not assign standard numerical percentages of impairment for mental illness, it does not *prohibit* assigning a numerical percentage based on an individualized medical evaluation.   It is evident that the editors of the fourth edition were reluctant to dictate standardized percentages for specific mental conditions because there are many variables that influence how a particular mental condition affects each individual's health status.

*Id.*

[¶ 9]   *Harvey* involved an employee who suffered a mental condition that resulted from a physical injury.  The matter before us involves a mental injury resulting from work-related stress.  Because the rationale we embraced in *Harvey* applies equally to mental injuries resulting from work-related stress, the hearing officer in this case was authorized to assign a numerical percentage of permanent impairment to Smart's mental stress injury.

> Permanent impairment shall be determined after the effective date of this rule by use of the American Medical Association's "Guides to the Evaluation of Permanent Impairment," 4th edition, copyright 1993.

[¶ 10]   Having determined that it was proper to assign an impairment rating, we must next decide whether the particular impairment rating assigned comports with the mandate in Me. W.C.B. Rule ch. 7, § 6, requiring that permanent impairment be determined pursuant to the fourth edition of the AMA *Guides*.

## B.   The 40% Permanent Impairment Rating

[¶ 11]   The evaluation of mental and behavioral permanent impairment is governed by chapter fourteen in the fourth edition of the AMA *Guides*.  Chapter fourteen outlines a method of assessment including identifying five classifications of impairment, but does not assign numerical impairment ratings for them.[5]   AMA *Guides* at 291–302; *Harvey*, ¶¶ 18–20, 957 A.2d at 965–66.  Despite the lack of specified percentages in chapter fourteen, we stated in *Harvey* that evaluators may arrive at a numerical rating by a method that "represents a fair analogue to the impairment classifications described, but not rated, in chapter fourteen" provided that the method is "circumscribed within the fourth edition of the AMA *Guides*."  *Harvey*, ¶ 28, 957 A.2d at 968.

[¶ 12]   In *Harvey*, the hearing officer found that the employee suffered 7% permanent impairment as a result of depression, relying on an IME opinion that established this figure by referring to chapter four of the AMA *Guides*, which governs the assessment of neurological injuries. *Id*. ¶¶ 22–23, 957 A.2d at 966.   The IME correlated Harvey's classification from chapter fourteen with a similar classification identified in Table 3, the "Emotional or Behavioral Impairments" table in chapter four, which sets forth numerical percentages for assignment to neurological conditions that have psychiatric features, including depression.   *Id.* ¶ 28, 957 A.2d at 968.   We upheld the 7% permanent impairment rating based on the IME opinion because the classifications rated in Table 3 of chapter four are fairly analogous to those described but not rated in chapter fourteen.   *Id*.  We noted that chapter four expressly states that the criteria for evaluating neurological emotional and behavioral conditions relate to the criteria for evaluating mental and behavioral impairments. *Id.*;  *see* AMA *Guides* at 142.

■   [¶ 13]   In this case, the IME opined that Smart's permanent impairment level "would fall very close to 45%." She arrived at her opinion by first considering the categories set forth in chapter fourteen of the AMA *Guides*, concluding that Smart has a "level of permanent impairment that falls toward the higher end of Class 3, Moderate."   When assigning a numerical percentage to that classification, she relied primarily[6] on the numerical scale set forth in the second edition of the AMA *Guides*.[7]   Although she acknowl-

---

5.   The five classifications of impairment are: "none," meaning no impairment; "mild," meaning impairment compatible with most useful functioning; "moderate," meaning impairment compatible with some but not all useful functioning; "marked," meaning impairment that significantly impedes useful functioning; or "extreme," meaning impairment not compatible with useful functioning. AMA *Guides* at 300–01.

6.   In addition to the percentages set forth in the second edition of the AMA *Guides,* the hearing officer also relied on the Veterans' Administration Schedule for rating disabilities; and the Psychiatric Functional Impairment Table used by the U.S. Navy and Marine Corps.

7.   Chapter fourteen of the fourth edition of the AMA *Guides* notes that the second edition set forth percentages for the categories of impairment as follows: normal—0–5%, mild—10–20%, moderate—25–50%, moderately severe—55–75%, and severe—greater than 75%. AMA *Guides* at 301.

edged in her deposition that other doctors may disagree, she stated in her report that she did not find Table 3 from chapter four of the fourth edition helpful in assessing impairment from non-neurological conditions, which, she opined "may be very similar in presentation" but "often they are very different in etiology, treatment and prognosis."

[¶ 14] The hearing officer, finding no clear and convincing evidence to the contrary, and without the guidance provided by our opinion in *Harvey*, accepted the IME's opinion and assigned a rating of 40% permanent impairment. The Department contends that the IME's opinion is not probative of permanent impairment level pursuant to the Act and Rules because she improperly relied on sources other than the fourth edition of the AMA *Guides* to arrive at the numerical percentage. We agree.

[¶ 15] The AMA *Guides* does not preclude assignment of a numerical percentage to permanent mental impairment, and leaves it to the evaluating physician to use his or her best judgment and clinical expertise to rate impairment from mental conditions. AMA *Guides* at 301. However, the hearing officer's decision to rely on and adopt an opinion based on that judgment and expertise is circumscribed by the Board's mandate to determine permanent impairment pursuant to the fourth edition of the AMA *Guides*. The percentage of impairment assigned to Smart was arrived at with specific reference to the percentages set forth in the second edition. These percentages were expressly rejected by the editors of the fourth edition who

noted that "[t]he procedure for the second edition was highly subjective." AMA *Guides* at 301. The fact that the IME in this case derived the percentage of impairment by use of the second edition is incompatible with the mandate to use the fourth edition and renders the opinion unsustainable on the issue of the degree of Smart's permanent impairment.[8]

[¶ 16] Because there is no competent evidence in the record to support the hearing officer's decision that Smart suffers 40% permanent impairment, the decision must be vacated, and the case remanded for a redetermination of permanent impairment.[9]

The entry is:

The decision of the hearing officer of the Workers' Compensation Board is vacated and the case remanded for proceedings consistent with this opinion.

SILVER, J., dissenting.

[¶ 17] I respectfully dissent from the Court's conclusion that the hearing officer erred when adopting the independent medical examiner's (IME) opinion that Smart suffers 40% permanent impairment because the IME consulted sources outside the American Medical Association, *Guides to the Evaluation of Permanent Impairment* (4th ed. 1993) (AMA *Guides*) and in particular the percentages outlined in the second edition of the AMA *Guides*. In my view, neither the Workers' Compensation Act nor Board Rules mandate that percentages of permanent mental impairment be calculated by referring only to numeri-

8. Two other medical opinions considered by the hearing officer place Smart in the range of 25 to 50% permanent impairment, with both doctors using the second edition of the AMA *Guides* to arrive at the range of impairment.

9. The Department also contends that the IME's opinion is incompetent on the basis that it was not rendered to a reasonable degree of medical certainty. Because we find the opinion to be incompetent evidence of permanent impairment on other grounds, we do not reach that issue.

cal percentages set forth within the fourth edition. Evaluators making this medical determination should not be precluded from looking to valid sources outside of the fourth edition for guidance.

[¶ 18] The editors of the fourth edition recognized the inherent limitations on a doctor's ability to accurately measure permanent impairment that results from mental and behavioral conditions. AMA Guides at 301. Instead of delineating standard percentages for assignment to specific classifications of permanent mental impairment, they directed evaluators to use their best judgment based on clinical impressions when it is essential to make an estimate, stating:

> Physicians, of course, must often make judgments based more on clinical impressions than on accurate, objective, analytic empiric evidence. In those circumstances in which it is essential to make an estimate, the ordinal or numeric scale might be of some general use....
>
> Eventually, research may disclose direct relationships between medical findings and percentages of mental impairment. Until that time, the medical profession must refine its concepts of mental impairment, improve its ability to measure limitations, and continue to make clinical judgments.

*Id.*

[¶ 19] Moreover, the fourth edition of the AMA *Guides* defines impairment as "an alteration of an individual's health status," and directs that impairment be assessed by medical means because it is a medical issue. *Id.* at 1. Doctors who use their best clinical judgment will consult a variety of sources to medically assess permanent mental impairment. Therefore, when arriving at a numerical percentage, it does not violate the Board's admonition to use the fourth edition when a doctor seeks guidance from other reliable medical sources outside the fourth edition. In fact, the fourth edition encourages this position by referring to other reliable resources such as the Social Security Administration, Listing of Impairments, Mental Disorders, 20 C.F.R. § 404, App. 1 (1985), and the World Health Organization, *Manual of the International Statistical Classification of Diseases, Injuries, and Causes of Death: International Classification of Diseases* (1978), when classifying mental and behavioral conditions. *Id.* at 291–302.

[¶ 20] Limiting the evaluator to referencing numerical percentages established within the fourth edition serves no useful purpose and is counter to the rationale of the majority's opinion here and in *Harvey v. H.C. Price Co.*, 2008 ME 161, 957 A.2d 960. A reasonable evaluator could conclude that the assessment method sanctioned in *Harvey* and enshrined in this case, in which the IME used the percentages in chapter four of the fourth edition applicable to neurological conditions with mental and behavioral features, is unsound. The IME in this case noted that while impairment from such neurological conditions may be similar to mental and behavioral impairment in presentation, such impairment may also be very different "in etiology, treatment and prognosis." Accordingly, she reasonably declined to apply the percentages in chapter four of the fourth edition and looked instead to other sources containing numerical percentages intended to apply to mental and behavioral conditions.

[¶ 21] It is consistent with the fourth edition for evaluators to use sound medical judgment, and sound medical judgment is based on the reservoir of knowledge, skill and wisdom each doctor has retained from her particular training, education and ex-

perience. The IME's opinion that Smart suffers 40% permanent impairment as a result of his mental stress injury is not incompatible with the fourth edition of the AMA *Guides,* and the hearing officer's decision to adopt that opinion should be affirmed.