MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2018 ME 77
Docket:        WCB-16-433
Argued:        September 13, 2017
Decided:       June 14, 2018

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:      SAUFLEY, C.J., and MEAD, GORMAN, HJELM, and HUMPHREY, JJ.
Dissent:       JABAR and ALEXANDER, JJ.
Dissent:       ALEXANDER, J.

GAETAN H. BOURGOIN

v.

TWIN RIVERS PAPER COMPANY, LLC, et al.

HJELM, J.

[¶1]   After sustaining a work-related injury, Gaetan H. Bourgoin was issued a certification to use medical marijuana as a result of chronic back pain. He successfully petitioned the Workers' Compensation Board for an order requiring his former employer, Twin Rivers Paper Company, LLC, to pay for the medical marijuana.  On this appeal from the decision of the Appellate Division affirming that award, we are called upon for the first time to consider the relationship between the federal Controlled Substances Act (CSA) and the Maine Medical Use of Marijuana Act (MMUMA).  We conclude that in the narrow circumstances of this case—where an employer is subject to an order that

would require it to subsidize an employee's acquisition of medical marijuana—there is a positive conflict between federal and state law, and as a result, the CSA preempts the MMUMA as applied here. *See* 21 U.S.C.S. § 903 (LEXIS through Pub. L. No. 115-181). We therefore vacate the decision of the Appellate Division.[1]

## I. BACKGROUND

[¶2]  Twin Rivers Paper Company, LLC, and Sedgwick Claims Management Services (collectively, Twin Rivers) appeal from a decision of the Workers' Compensation Board Appellate Division affirming a hearing officer's (*Pelletier, HO*)[2] decree that ordered Twin Rivers to pay the cost of medical marijuana used by its employee, Gaetan H. Bourgoin.

[¶3]  We draw the following facts, which are supported by the record, from the hearing officer's decree. *See Bailey v. City of Lewiston*, 2017 ME 160, ¶ 2, 168 A.3d 762.

---

[1]  Twin Rivers also challenges the Appellate Division's decision on several alternative grounds: (1) that Twin Rivers is a "private health insurer" and therefore is not required to reimburse an employee for medical marijuana treatment pursuant to 22 M.R.S. § 2426(2)(A) (2017); (2) that medical marijuana is not a "reasonable and proper" treatment pursuant to the Maine Workers' Compensation Act, 39-A M.R.S. § 206 (2017); and (3) that the hearing officer erred by rejecting the findings of the independent medical examiner, *see id.* § 312(7) (2017). Because the order requiring Twin Rivers to pay for Bourgoin's medical marijuana is barred by the CSA, we need not and do not reach these other reasons why Twin Rivers contends the order should be set aside.

[2]  The decree was entered on March 16, 2015, before the change in title from "hearing officer" to "administrative law judge." *See* P.L. 2015, ch. 297 (effective Oct. 15, 2015).

[¶4] Bourgoin worked as a paper machine laborer for Fraser Papers, which was subsequently acquired by Twin Rivers, at a paper mill in Madawaska from 1980 until 1989, when he sustained a work-related back injury. By agreement of the employer, Bourgoin was placed on total disability as a result of the injury. On three occasions, Twin Rivers filed a petition seeking a reduction in Bourgoin's incapacity, but each petition was denied, and he remains on total disability.

[¶5] As a result of his workplace injury, Bourgoin suffers from severe chronic pain syndrome. Bourgoin consulted with a number of pain management specialists and attempted a variety of treatments, including opioid medications, for his pain. Due to adverse side effects of his continued use of opioids, and on the recommendation of his primary care physician, Bourgoin stopped using narcotic medications. In January of 2012, Bourgoin obtained a medical marijuana certification and since then has used medical marijuana to manage his chronic pain. *See* 22 M.R.S. §§ 2421 to 2430-B (2017).

[¶6] In February of 2012, Bourgoin filed a "petition for payment of medical and related services" with the Workers' Compensation Board seeking payment from Twin Rivers for the cost of the medical marijuana. Twin Rivers opposed the petition on the ground, among others, that an order requiring it to

pay for Bourgoin's medical marijuana is barred by the CSA even if his use of medical marijuana were permitted by the MMUMA. Following a hearing, the hearing officer granted Bourgoin's petition in a written decision issued in March of 2015. Twin Rivers appealed to the Appellate Division, which affirmed the hearing officer's decision in August of 2016. We then granted Twin Rivers' petition for appellate review. *See* 39-A M.R.S. § 322 (2017); M.R. App. P. 23 (Tower 2016).[3]

## II. DISCUSSION

[¶7] Twin Rivers argues that the Controlled Substances Act, 21 U.S.C.S. §§ 801-904 (LEXIS through Pub. L. No. 115-181), preempts application of the MMUMA as a predicate for an order that would compel Twin Rivers to reimburse Bourgoin for the use of medical marijuana. Federal preemption is a question of law that we review de novo. *Guardianship of Smith*, 2011 ME 51, ¶ 10, 17 A.3d 136.

A.    Preemption Principles

[¶8] The preemption analysis must begin with the Supremacy Clause of the United States Constitution, which "unambiguously provides that if there is

---

[3] The restyled Maine Rules of Appellate Procedure do not apply because this appeal was filed prior to September 1, 2017. *See* M.R. App. P. 1 (restyled Rules).

any conflict between federal and state law, federal law shall prevail." *Gonzales v. Raich*, 545 U.S. 1, 29 (2005); *see* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land."). There are two "cornerstones" that guide our preemption analysis: first, "the ultimate touchstone in every pre-emption case" is Congress's purpose in enacting the federal law; and second, "in all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal [law] unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (alterations omitted) (citations omitted) (quotation marks omitted). Implementation of these principles serves to retain the "constitutionally mandated balance of power" between state and federal government. *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (quotation marks omitted).

[¶9] Federal law can preempt state law in three ways: first, by express preemption, where Congress expressly states that federal law preempts the state law; second, by field preemption, where Congress explicitly or implicitly leaves "no room" for state law, or where federal law is "so dominant" that it

"will be assumed to preclude enforcement" of the state law; and third, by conflict preemption, where the state law "actually conflicts with federal law." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (citations omitted); *see also Arizona v. United States*, 567 U.S. 387, 398-400 (2012); *Guardianship of Smith*, 2011 ME 51, ¶ 10, 17 A.3d 136.  It is the third type of preemption—conflict preemption—that is at issue here.

[¶10]  Conflict preemption arises in two circumstances.  The first is where "compliance with both federal and state [law] is a physical impossibility," *see Hillsborough Cty.*, 471 U.S. at 713 (citations omitted) (quotation marks omitted), because federal and state law "irreconcilabl[y] conflict" with one another, *see Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).  Second, conflict preemption occurs where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hillsborough Cty.*, 471 U.S. at 713 (quotation marks omitted); *see also Arizona*, 567 U.S. at 399.

[¶11] Here, Congress expressly regulated the consequence of any conflict that arises between the CSA and state law by including the following provision in the CSA:

> No provision of this title shall be construed as indicating an intent on the part of the Congress to occupy the field in which that

> provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, *unless there is a positive conflict between that provision of this title and that State law so that the two cannot consistently stand together.*

21 U.S.C.S. § 903 (emphasis added). Through this statutory provision, Congress has eliminated field preemption—but it has preserved the supremacy of the CSA where its provisions conflict with state law in a way that makes compliance with the requirements of both impossible. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *Robards v. Cotton Mill Assocs.*, 677 A.2d 540, 544 (Me. 1996). In this way, Congress has specified that the principles of conflict preemption are to be invoked to determine if state laws must yield to the CSA. Consequently, when framed in terms of the conflict preemption rubric, the dispositive question presented here is whether Twin Rivers is necessarily in violation of the CSA if it were to comply with the Board's order to pay for the medical marijuana that Bourgoin is authorized to use pursuant to the MMUMA.

B.     The Controlled Substances Act

[¶12]  Nearly half a century ago, the United States Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236 (LEXIS). Subchapter I of the Act, which was Title II in the original legislation, constitutes the Controlled Substances Act, 21 U.S.C.S.

§§ 801-904, which establishes laws pertinent to drug control and enforcement. *See* Pub. L. No. 91-513, §§ 100-709, 84 Stat. 1236, 1242-1284. The United States Supreme Court has characterized the CSA as "a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Raich*, 545 U.S. at 13; *see also* 21 U.S.C.S. § 801(1)-(6) (establishing Congressional "findings and declarations" regarding controlled substances); *United States v. Moore*, 423 U.S. 122, 134-35 (1975) (discussing the legislative history of the CSA).

[¶13] The CSA classifies substances subject to that legislation into five schedules that are differentiated based on three factors: their respective potential for abuse, the existence—or absence—of their currently accepted medical use, and risks they pose even when used under medical supervision. *See* 21 U.S.C.S § 812(a), (b). Marijuana is classified as a Schedule I drug, *see id.* § 812(c)(Sched. I)(c)(10), which is the category of substances that, as determined by Congress, have a high potential for abuse, do not have a currently accepted medical use for treatment, and pose unacceptable safety

risks even under medical supervision, *see id.* § 812(b)(1)(A)-(C).[4] This means that, with one exception that is not applicable here, *see infra* n.5, federal law bars the prescribed use of marijuana—and of any other Schedule I drug—even in a state with local laws allowing the medical use of marijuana. *See id.* §§ 812(b)(1)(A)-(C) (listing the "findings" required to classify a substance as a Schedule I drug), 829 (establishing parameters for prescriptions of schedule II-V drugs); *see also Raich*, 545 U.S. at 14, 27; *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001); *Mont. Caregivers Ass'n, LLC v. United States*, 841 F. Supp. 2d 1147, 1149-50 (D. Mont. 2012); *Ross v. RagingWire Telecomms., Inc.*, 174 P.3d 200, 204 (Cal. 2008); *People v. Crouse*, 388 P.3d 39, 41-42 (Colo. 2017).

[¶14] Although the CSA requires periodic updates of the schedules of controlled substances by the United States Attorney General, *see* 21 U.S.C.S. §§ 811, 812(a), marijuana has remained a Schedule I drug ever since the CSA was enacted in 1970. *See Raich*, 545 U.S. at 15 n.23 (discussing the history of challenges to reclassify marijuana from 1972 through 2001). This is true notwithstanding efforts by some to reclassify it—including, most recently,

---

[4] Substances listed in the other four schedules are deemed to present lesser concerns in relation to one or more of the three criteria used for categorization purposes. *See* 21 U.S.C.S. § 812(b)(2)-(5) (LEXIS through Pub. L. No. 115-181).

2016 denials of a challenge filed in 2011, *see* Denial of Petition to Initiate Proceedings to Reschedule Marijuana, 81 Fed. Reg. 53,687, 53,688-53,766 (Aug. 12, 2016), and in 2009, *see* Denial of Petition to Initiate Proceedings to Reschedule Marijuana, 81 Fed. Reg. 53,767, 53,767-53,845 (Aug. 12, 2016). *See also Americans for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 440-41, 452 (D.C. Cir. 2013) (affirming the denial of a petition to reclassify marijuana in a less restrictive schedule); *Washington v. Sessions*, 17 Civ. 5625 (AKH), 2018 U.S. Dist. LEXIS 30586, at *5-7 (S.D.N.Y. Feb. 26, 2018) (summarizing the procedure for petitioning for reclassification of a drug, including judicial review of the determination, and recent attempts at rescheduling the classification of marijuana); Denial of Petition to Initiate Proceedings to Reschedule Marijuana, 76 Fed. Reg. 40,551, 40,551-40,589 (July 8, 2011).

[¶15]  Because marijuana is a Schedule I substance, the CSA makes it a crime to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" marijuana, 21 U.S.C.S. § 841(a)(1), as well as to "knowingly or intentionally . . . possess a controlled substance," *id.* § 844(a).[5]  Further, and important to the question

---

[5] These prohibitions are subject to one exception, namely, the use of marijuana in research projects approved by the government—a circumstance not present here.  *See* 21 U.S.C.S. § 823(f) (LEXIS through Pub. L. No. 115-181); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 490 (2001) ("For marijuana (and other drugs that have been classified as 'schedule I' controlled

presented here, a federal prosecution can be directed against a "principal," which is defined as any individual who "commits an offense against the United States or *aids, abets*, counsels, commands, induces or procures its commission," 18 U.S.C.S. § 2(a) (LEXIS through Pub. L. No. 115-181) (emphasis added). Section 2 "reflects a centuries-old view of culpability: that a person may be

---

substances), there is but one express exception, and it is available only for Government-approved research projects, [section] 823(f).").

We note that section 844(a) of the CSA creates another exception to criminal liability for possession of scheduled drugs, but that exception is inapplicable to marijuana. Pursuant to that exception, possession of a controlled substance is permitted if it "was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of [that practitioner's] professional practice." 21 U.S.C.S. § 844(a) (LEXIS through Pub. L. No. 115-181); *see also id.* § 802(21) (LEXIS through Pub. L. No. 115-181) (defining "practitioner"). This exception does not extend to the possession of marijuana, however, because, by categorizing it as a Schedule I drug, Congress has determined that marijuana has "no currently accepted medical use in treatment" and that there is "a lack of accepted safety for use of the drug or other substance under medical supervision." *Id.* § 812(b)(1)(B)-(C) (LEXIS through Pub. L. No. 115-181); *see also Oakland Cannabis Buyers' Coop.*, 532 U.S. at 491 (stating that, as designated in the CSA, "marijuana has 'no currently accepted medical use' at all" (quoting 21 U.S.C.S. § 812 (LEXIS through Pub. L. No. 115-181))); *see also Gonzales v. Oregon*, 546 U.S. 243, 269 (2006) (stating that "Congress' express determination that marijuana had no accepted medical use foreclosed any argument about statutory coverage of drugs available by a doctor's prescription"); *Gonzales v. Raich*, 545 U.S. 1, 24 (2005) ("The [CSA] regulatory scheme is designed to foster the beneficial use of those medications [listed in Schedules II through V], to prevent their misuse, and to prohibit entirely the possession or use of substances listed in Schedule I, except as a part of a strictly controlled research project."); *United States v. Harvey*, 794 F. Supp. 2d 1103, 1105-07 (S.D. Cal. 2011) (concluding that, under California law, a "doctor's recommendation" for use of medical marijuana is not a "valid prescription or order" under section 844(a) of the CSA), *aff'd*, 659 F.3d 1272, 1274 (9th Cir. 2011) (with an "addition [that] [w]hat-ever else 'order' might mean under [section] 844(a) of the [CSA], it does not include a mere recommendation from a physician pursuant to the [California] Compassionate Use Act"). Further, the lawful parameters for prescribing controlled drugs or substances pursuant to the CSA do not extend to Schedule I drugs or substances. *See* 21 U.S.C.S. § 829 (LEXIS through Pub. L. No. 115-181).

Thus, a "written certification" for medical marijuana authorized by the MMUMA, 22 M.R.S. §§ 2422(16), 2423-B (2017), even when issued by a medical "practitioner" as defined by the CSA, 21 U.S.C.S. § 802(21), or a "medical provider" as defined by the MMUMA, 22 M.R.S. § 2422(4-C) (2017), is not a "valid prescription or order" that would exempt the resulting marijuana possession from the purview of the CSA.

responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014). As the *Rosemond* Court recognized, "almost every court of appeals has held [that] a defendant can be convicted as an aider and abettor without proof that he participated in each and every element of the offense." *Id.* at 1246 (quotation marks omitted) (alteration omitted). Thus, "a person is liable under [section] 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Id.* at 1245.

[¶16] The mens rea required for aiding and abetting is an "intent [that] must go to the specific and entire crime charged," such as "when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Id.* at 1248-49. Put another way, "for purposes of aiding and abetting law, a person who actively participates in a criminal scheme *knowing* its extent and character *intends* that scheme's commission," and, on that basis, is criminally liable. *Id.* at 1249 (emphasis added); *see also id.* at 1250 ("The law does not, nor should it, care whether [the defendant] participates with a happy heart or a sense of foreboding. Either way, [the defendant] has the same culpability, because

either way [the defendant] has *knowingly* elected to aid in the commission of a [crime]." (emphasis added)).  Therefore, were Twin Rivers to comply with the administrative order by subsidizing Bourgoin's use of medical marijuana, it would be engaging in conduct that meets all of the elements of criminal aiding and abetting as defined in section 2(a).[6]

---

[6] Title 18 U.S.C.S. § 2 (LEXIS through Pub. L. No. 115-181) contains two separate bases on which a third party may be held criminally liable.  As discussed in the text, section 2(a) imposes liability upon a person who aids and abets another person in committing the predicate crime.  *See supra* ¶¶ 15-16.  Section 2(b), in contrast, criminalizes the conduct of any individual who "*willfully* causes an act to be done which if directly performed by [that person] or another would be an offense against the United States."  (Emphasis added).

Although, in its 2014 opinion, the *Rosemond* Court addressed the mens rea requirement for aiding and abetting by citing generally to section 2, the statutory language that it quoted and substantively analyzed is found specifically in section 2(a).  *See Rosemond v. United States*, 134 S. Ct. 1240, 1243-45 (2014).  Section 2(a) does not require "willful[]" conduct because facilitation of the activity with knowledge of its illegal nature is sufficient to form a basis for criminal liability.  *See id.* at 1248-50; *see also, e.g.*, *United States v. Slatten*, 865 F.3d 767, 793 (D.C. Cir. 2017) ("To establish aiding and abetting, the government had to prove, beyond a reasonable doubt, that [the defendant] intentionally 'facilitated any part of the criminal venture,' with enough 'knowledge of the crime to enable [the defendant] to make the relevant legal (and indeed, moral) choice' to opt out instead." (quoting *Rosemond*, 134 S. Ct. at 1246, 1249) (alterations omitted)); *United States v. Ford*, 821 F.3d 63, 69 (1st Cir. 2016) ("The words 'aids [and] abets' . . . all suggest that a person violates section 2 only if the person has 'chosen, *with full knowledge*, to participate in the illegal scheme.'" (quoting *Rosemond*, 134 S. Ct. at 1250) (emphasis added)); *United States v. Encarnación-Ruiz*, 787 F.3d 581, 589-91 (1st Cir. 2015) (discussing the applicability of *Rosemond* to the crime of aiding and abetting another person's criminal conduct and stating that section 2(a) contains no explicit mens rea requirement but that courts have imposed a "knowledge" element); *United States v. Watson*, Nos. 3:11-CR-079 and 3:15-CV-044, 2016 U.S. Dist. LEXIS 88180, at *14 (S.D. Ohio July 7, 2016) (concluding "that [section] 2(a) describes an 'inchoate' offense, or, as Justice Kagan writes in *Rosemond*, it codifies the 'common-law standards for accomplice liability.'  Section 2(b), in contrast, does describe a substantive offense.").  Gauged by the language of section 2(a) and these judicial explanations of the criminal exposure created by that statute, Twin Rivers would act in contravention of the CSA if it were to fund Bourgoin's acquisition of medical marijuana.

Justice Jabar's dissenting opinion cites to section 2 generally but draws its analysis on the element of willfulness that is found in section 2(b) and not in section 2(a), and, on that basis, concludes that Twin Rivers would fall beyond *that* statute's reach.  *See* Jabar, J., Dissenting Opinion ¶¶ 40-45.  This

[¶17]   It also bears noting that aside from the exposure to a federal conviction itself, the penalties for violation of the CSA can be significant. Pursuant to the least severe penalty range for a violation of section 844—and, consequently, for aiding or abetting another person's violation of section 844— the sentence, at minimum, is a mandatory fine of $1,000, and it may also include as much as one year of incarceration, with an even greater sentence if certain aggravating factors are present, such as a prior conviction for any drug offense, including offenses established by the CSA.  *See* 21 U.S.C.S. § 844(a); *see also id.* § 841(b)(1)(A) (enhancing a mandatory sentence based on prior convictions of "felony drug offenses" to a range of at least twenty years in prison to a life term).

C.      The CSA and Maine's Medical Marijuana Law

[¶18]   This description of the scope and effect of federal regulation of marijuana brings us to the point where the CSA and Maine law intersect.  As relevant to this case, the Maine Medical Use of Marijuana Act, 22 M.R.S. §§ 2421

---

formulation of liability is entirely different from that set out in section 2(a), addressed in the text, *see supra* ¶¶ 15-16, which is based on conduct that *aids and abets* another's criminal activity.

Therefore, irrespective of whether Twin River's subsidization of Bourgoin's medical marijuana would expose Twin Rivers to prosecution pursuant to section 2(b), that conduct would nonetheless aid and abet Bourgoin's violation of the CSA and render Twin Rivers criminally liable pursuant to section 2(a).

to 2430-B, allows a "qualifying patient"[7] such as Bourgoin to possess a limited amount of marijuana for medical use. *Id.* §§ 2422(9), 2423-A(1) (authorizing the possession of marijuana). The written certification by a medical provider, which is effective for one year, is based on the professional's opinion that the "qualifying patient is likely to receive therapeutic benefit" from the medical marijuana used "to treat or alleviate the patient's debilitating medical condition." *Id.* § 2423-B.

[¶19] These conflicting federal and state laws, and their embodiment of competing policies and underlying conclusions about the efficacy of marijuana as a legitimate therapeutic substance, frame the narrow issue that is central to this case: given this network of statutes, can Twin Rivers be *required* to pay for Bourgoin's acquisition and use of marijuana—conduct that is proscribed by federal law but allowed by the State because a MMUMA certification had been issued to him?

[¶20] Compliance with both is an impossibility. Were Twin Rivers to comply with the hearing officer's order and knowingly reimburse Bourgoin for the cost of the medical marijuana as permitted by the MMUMA, Twin Rivers

---

[7] A "qualifying patient" is "a person who has been diagnosed by a medical provider as having a debilitating medical condition and who possesses a valid written certification regarding medical use of marijuana in accordance with section 2423-B." 22 M.R.S. § 2422(9) (2017).

would necessarily engage in conduct made criminal by the CSA because Twin Rivers would be aiding and abetting Bourgoin—in his purchase, possession, and use of marijuana—by acting with knowledge that it was subsidizing Bourgoin's purchase of marijuana. *See* 18 U.S.C.S. § 2(a); 21 U.S.C.S. § 844(a); *Rosemond*, 134 S. Ct. at 1248-50; *see also, e.g.*, *United States v. Pinillos-Prieto*, 419 F.3d 61, 63-66 (1st Cir. 2005) (describing a third-party intermediary drug transaction that resulted in guilty verdicts for aiding and abetting); *United States v. Dingle*, 114 F.3d 307, 309-12 (D.C. Cir. 1997) (affirming the defendant's conviction for aiding and abetting illegal drug possession).[8] Conversely, if Twin Rivers complied with the CSA by *not* reimbursing Bourgoin for the costs of medical marijuana, Twin Rivers would necessarily violate the MMUMA-based order of the hearing officer.

[¶21] Several courts have held that a consumer's state-law-compliant *choice* to use medical marijuana does not trigger the limited preemption provision of section 903. *See, e.g.*, *Reed-Kaliher v. Hoggatt*, 347 P.3d 136, 141-42 (Ariz. 2015); *Ter Beek v. City of Wyoming*, 846 N.W.2d 531, 537-38 (Mich. 2014);

---

[8] Furthermore, although Justice Jabar's dissenting opinion, *see* Jabar, J., Dissenting Opinion ¶¶ 45-46, draws on the hypothetical situation posed in *Rosemond*, where a third-party gun store owner knows but does not care how an illegally sold gun will be used, Twin Rivers would not be "incidentally facilitat[ing] a criminal venture" but rather would be "actively participat[ing] in it" by knowingly paying for Bourgoin's purchase and possession of medical marijuana. *Rosemond*, 134 S. Ct. at 1249 n.8.

*Qualified Patients Ass'n v. City of Anaheim*, 187 Cal. App. 4th 734, 757 (Cal. Ct. App. 2010). This is because state laws, such as the MMUMA, provide safe harbor from *state* prosecution, but do not—and cannot—create a "state right to commit a federal crime," meaning that the state law protections have no bearing on *federal* criminalization or exposure to federal prosecution for that conduct. *Mont. Caregivers Ass'n, LLC*, 841 F. Supp. 2d at 1150; *see also Raich*, 545 U.S. at 26-27; *Garcia v. Tractor Supply Co.*, 154 F. Supp. 3d 1225, 1229-30 (D.N.M. 2016); *Qualified Patients Ass'n*, 187 Cal. App. 4th at 757; *Ter Beek*, 846 N.W.2d at 540. This case, however, does not call for us to determine whether that legal analysis would protect the MMUMA generally. The cases of broader application, however, help to reveal the critical point that, in the case before us, the Appellate Division, by affirming an order issued by the hearing officer, would *require* Twin Rivers to engage in conduct that constitutes a violation of the CSA.

[¶22] The preemptive effect of the CSA on state marijuana laws has been addressed in several cases involving circumstances similar to the one presented here, where a party—such as Twin Rivers—was confronted with a mandate to engage in conduct that would be violative of the CSA. Two courts, for example, have held that a state law authorizing medical marijuana use does

not require an employer to treat an employee's medical use of marijuana as a reasonable workplace accommodation. *See Garcia*, 154 F. Supp. 3d at 1230; *Emerald Steel Fabricators, Inc. v. Bureau of Labor & Indus.*, 230 P.3d 518, 536 (Or. 2010). In *Garcia*, an employee asserted that his termination from employment based on a positive test for cannabis metabolites was a form of unlawful discrimination because he was using medical marijuana for a disabling medical condition. 154 F. Supp. 3d at 1227. The court granted the employer's motion to dismiss the complaint because, in that context, the CSA preempted New Mexico's medical marijuana law. *Id.* at 1229-30. In part, the court reasoned that "[t]o *affirmatively require* [the employer] to accommodate [the employee's] illegal drug use would *mandate* [the employer] to permit the very conduct the CSA proscribes." *Id.* at 1230 (emphasis added).

[¶23] Similarly, the Oregon Supreme Court has held that Oregon's medical marijuana law did not *require* an employer to accommodate an employee's use of medical marijuana pursuant to the principle of obstacle preemption, a form of conflict preemption, *see supra* ¶ 10, and therefore that "[t]o the extent that [the state medical marijuana law] affirmatively authorizes the use of medical marijuana, federal law preempts that subsection, leaving it without effect." *Emerald Steel Fabricators, Inc.*, 230 P.3d at 529 (quotation

marks omitted); *see also Washburn v. Columbia Forest Prods., Inc.*, 134 P.3d 161, 167-68 (Or. 2006) (Kistler, J., concurring) (stating that "[t]he fact that the state may choose to exempt medical marijuana users from the reach of the state criminal law does not mean that the state can affirmatively require employers to accommodate what federal law specifically prohibits").

[¶24]  As these cases demonstrate, a person's right to use medical marijuana cannot be converted into a sword that would require another party, such as Twin Rivers, to engage in conduct that would violate the CSA.

[¶25]  In a third case of relevance, although presenting a very different factual situation, the Supreme Court of Colorado considered whether the Colorado medical marijuana law—which is now part of that state's Constitution, *see* Colo. Const. art. XVIII, § 14—may be enforced in a way that would violate the CSA.  *Crouse*, 388 P.3d at 40.  The Colorado law required law enforcement officers to return seized medical marijuana if the person whose marijuana had been seized was later acquitted of the underlying state drug charge.  *Id.* at 40-41.  The officers declined to comply with that law because they claimed that, by doing so, they would be distributing marijuana in violation of the CSA.  *Id.* at 41.  The court held that "[b]ecause compliance with one law necessarily requires noncompliance with the other, there is a positive conflict

between [the state constitution] and the CSA such that the two cannot consistently stand together." *Id.* at 42 (quotation marks omitted). Analytically, there is no difference between the circumstances of *Crouse* and this case: Compelling an employer to subsidize an employee's medical marijuana will require the employer to commit a federal crime—aiding or abetting the distribution and possession of marijuana, *see* 18 U.S.C.S. § 2(a); 21 U.S.C.S. § 844(a)—just as Colorado law would have required law enforcement officers to distribute drugs in violation of the CSA.

[¶26] In affirming the hearing officer's decision, the Appellate Division[9] explicitly relied on the Department of Justice's 2009 "Ogden Memo," which assigned low priority to the prosecution of medical-marijuana-based violations of federal drug laws. David W. Ogden, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum for Selected United States Attorneys: Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana 1-2 (Oct. 19, 2009); *see also Noll v. Lepage Bakeries, Inc.*, Me. W.C.B. No. 16-25, ¶¶ 14-15 (App. Div. 2016). Any reliance on this internal departmental policy, however,

---

[9] In its preemption analysis set out in the decision it issued in this case, the Appellate Division incorporated a discussion found in a decision issued the same day in a different case, *Noll v. Lepage Bakeries, Inc.*, Me. W.C.B. No. 16-25, ¶¶ 11-15 (App. Div. 2016). We therefore address the Board's reasoning as described in the latter case.

is entirely misplaced. Such a policy is transitory, as is irrefutably demonstrated by its recent revocation by the current administration.[10]

[¶27] Even more significantly, the Ogden Memo itself made clear that it was directed only to the question of *enforcement* of laws but did nothing to challenge their *existence*. David W. Ogden, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum for Selected United States Attorneys: Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana 1; *see United States v. Hicks*, 722 F. Supp. 2d 829, 833-34 (E.D. Mich. 2010) (addressing the DOJ memoranda and concluding that the "[DOJ]'s discretionary decision to direct its resources elsewhere does not mean that the federal government now lacks the power to prosecute those who possess marijuana"). In fact, the Ogden Memo expressly states that it merely provided "guidance regarding resource

---

[10] That federal policy change occurred in early 2018, when the United States Attorney General issued a memorandum declaring that "previous nationwide guidance specific to marijuana enforcement is unnecessary and is rescinded, effective immediately." Jefferson B. Sessions III, Att'y Gen., U.S. Dep't of Justice, Memorandum for All United States Attorneys: Marijuana Enforcement (Jan. 4, 2018). This rescinded prosecutorial policies that had not included medical marijuana among its enforcement priorities. *See* James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum for All United States Attorneys: Guidance Regarding Marijuana Enforcement (Aug. 29, 2013); James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum for United States Attorneys: Guidance Regarding the Ogden Memo in Jurisdictions Seeking to Authorize Marijuana for Medical Use (June 29, 2011); David W. Ogden, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum for Selected United States Attorneys: Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana 1-2 (Oct. 19, 2009) (stating that the "pursuit of [the Department's] priorities should not focus federal resources in . . . States on individuals whose actions are in clear and unambiguous compliance with existing state laws providing for the medical use of marijuana").

allocation [and] does not 'legalize' marijuana or provide a legal defense to a violation of federal law. . . . Nor does clear and unambiguous compliance with state law . . . create a legal defense to a violation of the [CSA]." David W. Ogden, Deputy Att'y Gen., U.S. Dep't of Justice, Memorandum for Selected United States Attorneys: Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana 2; *see also Mont. Caregivers Ass'n, LLC*, 841 F. Supp. 2d at 1148-49 ("A reasonable person, having read the entirety of the Ogden Memo, could not conclude that the federal government was somehow authorizing the production and consumption of marijuana for medical purposes. Any suggestion to the contrary defies the plain language of the Memo."). Therefore, even if the policy expressed in the Ogden Memo were alive today, it could not weaken the conclusion that there is a positive conflict between the CSA and the MMUMA as applied here.

[¶28]  Most importantly, however, the magnitude of the *risk* of criminal prosecution is immaterial in this case. Prosecuted or not, the fact remains that Twin Rivers would be forced to commit a federal crime if it complied with the directive of the Workers' Compensation Board.[11] *See Skinner v. Ry. Labor Execs.'*

---

[11]  The Board also relied on two decisions issued by the New Mexico intermediate appeals court in cases that raised the type of issue presented here, namely, whether the New Mexico Workers' Compensation Act required an employer to reimburse an eligible employee for the cost of medical marijuana that the employee was permitted to use pursuant to New Mexico's medical marijuana act.

*Ass'n*, 489 U.S. 602, 651 (1989) (Marshall, J., dissenting) ("The absence of prosecutions to date . . . hardly proves that prosecutors will not avail themselves [of the applicable law] in the future.").

## III. CONCLUSION

[¶29] Through its enactment of the MMUMA, the Maine Legislature has exempted qualifying patients and other specified individuals from state prosecution that otherwise could arise from the medical use of marijuana. The Legislature, however, does not have the power to change or restrict the application of federal law that positively conflicts with state law. *See* U.S. Const. art. VI, cl. 2. So long as marijuana remains a Schedule I substance under the CSA, *see* 21 U.S.C.S. § 812(c)(Sched. I)(c)(10), an employer that is ordered to compensate an employee for medical marijuana costs is thereby required to commit a federal crime defined by the CSA. *See* 18 U.S.C.S. § 2(a); 21 U.S.C.S. § 844(a). This creates a positive conflict between the CSA and this application

---

*See Lewis v. Am. Gen. Media*, 355 P.3d 850 (N.M. Ct. App. 2015); *Vialpando v. Ben's Auto Servs.*, 331 P.3d 975 (N.M. Ct. App. 2014). In the earlier of those cases the court declined to reach the question of federal preemption, concluding in effect that the employer had not preserved the issue. *Vialpando*, 331 P.3d at 979-80. In the second case, the court, relying in part on *Vialpando*—an opinion that did not reach the merits of the issue—rejected the contention that the CSA trumped any requirement that the employer subsidize the cost of medical marijuana because, the court reasoned, the DOJ enforcement memos rendered the prospect of prosecution under the CSA to be speculative. *Lewis*, 355 P.3d at 858-59. To the limited extent these cases address the merits of the preemption issue, the analysis is less than compelling, and we decline to follow their lead.

of the MMUMA.  *See* 21 U.S.C.S. § 903.  As invoked against Twin Rivers, the MMUMA requires what federal law forbids, and the authority ostensibly provided by the Maine law is "without effect."  *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 486-87 (2013) (quotation marks omitted); *Robards*, 677 A.2d at 543 (quotation marks omitted).

[¶30]  Because the CSA preempts the MMUMA when the MMUMA is used as the basis for requiring an employer to reimburse an employee for the cost of medical marijuana, the order based on the MMUMA must yield.  We therefore vacate the decision of the Appellate Division.

The entry is:

> Judgment vacated.  Remanded to the Workers' Compensation Appellate Division with instructions to vacate the decision of the hearing officer and remand for denial of the petition for payment of medical expenses and services.

---

JABAR, J., with whom ALEXANDER, J., joins, dissenting.

[¶31]  I respectfully dissent because I do not believe that the federal Controlled Substances Act (CSA) preempts the Maine Medical Use of Marijuana Act (MMUMA) in this case.

A.      Preemption Analysis

[¶32]   The United States Supreme Court has recognized that in "all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation marks omitted).  Central to this initial assumption is the theoretical underpinning that our nation was founded upon: "federalism . . . allow[s] the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (quotation marks omitted).  Particularly relevant to this case, "[t]he structure and operation of the CSA presume and rely upon a functioning medical profession regulated under the States' police powers."  *Id.*  And in Maine, we have been clear:

> In cases where federal law is said to bar state action in fields of traditional state regulation, *such as workers' compensation legislation*, there is an assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest intent [of Congress].

*Ciampi v. Hannaford Bros. Co.*, 681 A.2d 4, 8 (Me. 1996) (emphasis added) (quotation marks omitted). "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) (alteration omitted) (quotation marks omitted).

[¶33] In order to determine whether the CSA preempts the MMUMA here, we must determine whether it is the "clear" or "manifest" purpose of Congress to preempt a state workers' compensation board from ordering an employer to reimburse an employee for valid medical expenses related to properly certified medical marijuana. As the Court states, the CSA contains the following provision regarding preemption:

> No provision of this title shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, *unless there is a positive conflict between that provision of this title and that State law so that the two cannot consistently stand together.*

21 U.S.C.S. § 903 (LEXIS through Pub. L. No. 115-181) (emphasis added); Court's Opinion ¶ 11. Our question now becomes whether a "positive conflict" exists here.

[¶34] A positive conflict arises "when compliance with both state and federal requirements is *impossible*." *Robards v. Cotton Mill Assocs.*, 677 A.2d 540, 544 (Me. 1996) (emphasis added). In the words of Erwin Chemerinsky, a preeminent scholar of constitutional law, and his co-authors,

> The phrase positive conflict . . . so that the two cannot consistently stand together in section 903 has been interpreted as narrowly restricting the preemptive reach of the CSA to cases of an actual conflict with federal law such that compliance with both federal and state regulations is a *physical* impossibility. Justice Scalia has written that the plain language of section 903 states a congressional intent that the CSA preempt only *state laws* that require someone to engage in an action *specifically* forbidden by the CSA. As a California appellate court succinctly put it, mere speculation about a hypothetical conflict is not the stuff of which preemption is made.
>
> It is not physically impossible to comply with both the CSA and state marijuana laws; nothing in the more liberal state laws requires anyone to act contrary to the CSA. Only if a *state law* required a citizen to *possess*, *manufacture*, or *distribute* marijuana in violation of federal law would it be impossible for a citizen to comply with both state and federal law. Similarly, if a state were to make state officers the manufacturers or distributors of marijuana, it might well be impossible for those officials to comply with both state and federal law. No state marijuana law, however, has attempted to require state or local officials to violate the CSA in this manner.

Erwin Chemerinsky et al., *Cooperative Federalism and Marijuana Regulation*, 62 UCLA L. Rev. 74, 105-06 (2015) (emphases added) (footnotes omitted) (quotation marks omitted).

[¶35] Turning to the supposedly conflicting laws, the MMUMA allows a medical provider to "provide a written certification for the medical use of marijuana" if a "qualifying patient is likely to receive therapeutic benefit" from its use "to treat or alleviate the patient's debilitating medical condition." 22 M.R.S. § 2423-B (2017). Pursuant to the CSA, on the other hand, it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" marijuana. 21 U.S.C.S. § 841(a) (LEXIS through Pub. L. No. 115-181). The CSA also makes it unlawful to knowingly or intentionally possess marijuana. *Id.* § 844(a) (LEXIS through Pub. L. No. 115-181).

[¶36] Here, there is no positive conflict between the CSA and the MMUMA because there is no state law that requires the employer—or any person or entity—to possess, manufacture, or distribute marijuana. In other words, compliance with both the federal law and the Workers' Compensation Board (WCB) order is possible: reimbursement does not require the employer to *physically* manufacture, distribute, dispense, or possess marijuana, and, as a

result, no physical impossibility exists between the federal law and the WCB order in this case. Adopting Chemerinsky's analysis of section 903 of the CSA, because there is no physical impossibility here, and because Congress has not expressed a clear and manifest preemptive intent regarding state workers' compensation boards and reimbursement for state-law compliant medical marijuana use, *see Ciampi*, 681 A.2d at 8, no positive conflict exists.

[¶37]  The employer and the Court point to the Colorado case of *People v. Crouse* to support the argument that reimbursement creates a positive conflict. 388 P.3d 39 (Colo. 2017); Court's Opinion ¶ 25.  That case, however, serves to highlight the exact reason that no positive conflict exists in Bourgoin's case.  In *Crouse*, the Colorado Supreme Court held that there was a positive conflict between the CSA and its constitution—its *state law*—that required police officers to *physically distribute* seized medical marijuana to individuals who had been charged and acquitted of the crime that led to the seizure. *Id.* at 40.  The conflict existed because of the actual physical impossibility that existed between the Colorado state law and the CSA: the officers were—literally— required to *physically distribute* the marijuana, and the CSA makes *distribution* unlawful. *Id.* at 42; 21 U.S.C.S. § 841(a).

[¶38] This case is unlike *People v. Crouse*. There is a difference in both nature and degree between following a WCB order to reimburse a worker for medical treatment authorized by a physician and approved by the WCB and a state law that requires police officers to physically distribute marijuana. The key distinction is that the police officers' actions in *Crouse* fit within an actual, proscribed activity specifically *defined* by the CSA. *See Crouse*, 388 P.3d at 41. Because the officers would be required to "deliver," meaning engage in "the actual, constructive, or attempted transfer of a controlled substance," there was a physical impossibility between the state law and the CSA. *See id.* at 42 (quotation marks omitted); *see also* 21 U.S.C.S. § 802(8), (11) (LEXIS through Pub. L. No. 115-181). Here, unlike in *Crouse*, the employer's reimbursement does not fall into any category of defined or proscribed activity under the CSA. Because the employer is not required to physically engage in activity that the CSA proscribes, there is no positive conflict in this case.

B.      Aiding and Abetting

[¶39] The Court's primary legal theory—that because the employer would be aiding and abetting Bourgoin's possession, the CSA preempts the MMUMA here—is unpersuasive because the government would not be able to prove that the employer would be acting with the specific intent necessary to

establish the requisite mens rea element of the offense of aiding and abetting. *See* 18 U.S.C.S. § 2 (LEXIS through Pub. L. No. 115-181). Further, the Court's analysis on aiding and abetting is speculative because it is not specific or certain enough to show that there is a positive conflict in this case such that the Court can conclude that preemption here is the "manifest" purpose of Congress. *See Wyeth*, 555 U.S. at 565. At most, whether the government would be able to prove the mens rea element is hypothetical, and hypotheticals do not give rise to preemption. *See, e.g., Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 131 (1978); *see also Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982) ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute. A state regulatory scheme is not preempted by the federal . . . laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the [federal] laws.").

[¶40] A person is punishable as a principal under federal law if that person "aids, abets, counsels, commands, induces or procures [a crime's] commission" or "willfully causes an act to be done which if directly performed by [that person] or another would be an offense against the United States." 18 U.S.C.S. § 2. In 1938, Judge Learned Hand set forth a definition of the

necessary mens rea for all aiding and abetting offenses, stating that in order to be guilty of aiding and abetting, it is necessary that the alleged aider or abettor "participate in [the venture] as in something that he *wishes* to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (emphasis added). About a decade later, in *Nye & Nissen v. United States*, the United States Supreme Court quoted Judge Hand's formulation, affirming this theory of mens rea for the offense of aiding and abetting. *See* 336 U.S. 613, 618-19 (1949)*.*

[¶41] Since *Nye & Nissen*, federal courts have continued to hold that the accomplice must *wish* or *desire* to bring about the success of the principal in committing the underlying substantive offense in order to be punishable as a principal. *See United States v. Zafiro*, 945 F.2d 881, 887 (7th Cir. 1991) ("To be proved guilty of aiding and abetting, . . . the defendant [must have] desired the illegal activity to succeed."); *United States v. Poston*, 902 F.2d 90, 93 (D.C. Cir. 1990) (quoting Judge Hand's formulation); *United States v. Indelicato*, 611 F.2d 376, 385 (1st Cir. 1979) ("To sustain a conviction on the aiding and abetting . . . counts, the government had to prove beyond a reasonable doubt that appellant willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wished to

bring about."); *United States v. Newman*, 490 F.2d 139, 143 (3d Cir. 1974) ("[T]he government must prove beyond a reasonable doubt that the defendant participated in a substantive crime *with the desire that the crime be accomplished*.").

[¶42] In other words, the crime of aiding and abetting is a specific intent crime. *See United States v. Nacotee*, 159 F.3d 1073, 1076 (7th Cir. 1998) ("To be liable under an aiding and abetting theory . . . a defendant must have had the specific intent to aid in the commission of the crime in doing whatever she did to facilitate its commission."); *Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987) ("Aiding and abetting in the criminal law requires not only knowledge of the principal's objective but a desire to help him attain it."). In *Zafiro*, Judge Posner explained further,

> To be proved guilty of aiding and abetting, [it] must be established[] that the defendant desired the illegal activity to succeed. The purpose of this requirement is a little mysterious but we think it is to identify, and confine punishment to, those forms of assistance the prevention of which makes it more difficult to carry on the illegal activity assisted.

945 F.2d at 887.

[¶43] In distancing its own analysis and view of liability for aiding and abetting from that set forth here, the Court distinguishes between the criminal liability element contained in, on the one hand, 18 U.S.C.S. § 2(a) and, on the

other, 18 U.S.C.S. § 2(b). Court's Opinion ¶ 16 n.6. However, the above discussion—of the general principles underlying aiding and abetting liability—is not premised on that distinction. The Court's discussion fails to adequately account for the origin of the specific intent element that *both* section 2(a) and 2(b) contain. It is the common law—not the statutory law—that generates the necessary specific intent element of section two liability for aiding and abetting, and Congress's decision not to set forth the requisite mental state in section 2(a) does not mean that the element is lacking, or that it is anything other than what the common law has said that it is. *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 605-06 (1994) ("Indeed, we have noted that the common-law rule requiring *mens rea* has been followed in regard to statutory crimes even where the statutory definition did not in terms include it.") (quotation marks omitted).

[¶44] In this context, the common law establishes the requisite mens rea element for all of section two. *See Nye & Nissen*, 336 U.S. at 618-19 (discussing the intent requirement for offenses of aiding and abetting). Moreover, *Nye & Nissen*, decided in 1949, predated Congress's 1951 amendment of section 2(b); prior to the 1951 amendment, the word "willful" was absent from section two. *See* Act of Oct. 31, 1951, ch. 655, 65 Stat. 710, 717 (LEXIS). That Congress did not add "willful" to section 2(a) in 1951 does not mean that Congress

intended to eliminate the specific intent or "willfulness" for section 2(a) liability; indeed, the opposite conception of the rationale underlying the omission is stronger. *See* Baruch Weiss, *What Were They Thinking?: The Mental States of the Aider and Abettor and the Causer Under Federal Law*, 70 Fordham L. Rev. 1341, 1447 (2002) ("In fact, what little information that exists seems to suggest . . . that the word [willfully] was added by Congress [in 1951] not to differentiate between the two types of accomplices, but rather to confirm Judge Learned Hand's repeated efforts to equate them. The word was needed to bring the causing subsection in line with the aiding and abetting subsection, which had no need for the word because its verbs – aid, abet, counsel, command, induce, and procure – sufficiently convey the concept of willful[ness].") (quotation marks omitted)).

[¶45]     Here, the employer's compliance with the WCB's order to reimburse Bourgoin's state-law-compliant medical expenses is insufficient to give rise to the specific intent element of aiding and abetting, regardless of with which prong under section two the United States may or may not charge the employer. The Court does not analyze how the government would be able to meet its burden to prove beyond a reasonable doubt that the employer itself actually *desired* or *wished* that Bourgoin be successful in committing the

underlying federal offense; I do not agree that mere knowledge is sufficient. According to the Court, however, the employer "would be aiding and abetting Bourgoin—in his purchase, possession, and use of marijuana—*by acting with knowledge* that it was subsidizing Bourgoin's purchase of marijuana." Court's Opinion ¶ 20 (emphasis added). To support this proposition, the Court cites to, among other sources of law, *Rosemond v. United States*, 134 S. Ct. 1240, 1248-50 (2014). That case, however, "did not deal . . . with defendants who incidentally facilitate a criminal venture rather than actively participate in it." *Id.* at 1249 n.8. The *Rosemond* Court discussed the type of activity that would not give rise to the requisite specific intent: "A hypothetical case is the owner of a gun store who sells a firearm to a criminal, knowing but not caring how the gun will be used. We express no view about what sort of facts, if any, would suffice to show that such a third party has the intent necessary to be convicted of aiding and abetting." *Id.*

[¶46] In contrast, the employer in this case is even further removed from Bourgoin than the gun store owner is from the "criminal" in the *Rosemond* hypothetical; completely disinterested in Bourgoin's use or possession of marijuana—and indeed only reimbursing him for his medical expenses as ordered by the WCB—the employer is not an active participant in the

substantive "offense" of Bourgoin's possession. Contrary to the Court's conclusion, I do not agree that mere knowledge constitutes active participation in the commission of a crime, the effective accomplishment of which the accomplice himself or herself must *wish* or *desire* to bring about in order to establish the requisite specific intent that the offense of aiding and abetting demands.

[¶47] In fact, the existence of this litigation vitiates the specific intent element that the government would have to prove if it even decided to prosecute the employer. Regardless, whether the government would be able to prove the requisite mens rea beyond a reasonable doubt is speculative, and because speculative conflicts and hypotheticals do not give rise to preemption, *see, e.g.*, *Exxon Corp.*, 437 U.S. at 131, reliance on the doctrine of aiding and abetting to declare that it was Congress's manifest purpose to preempt the WCB from ordering reimbursement is far too tenuous. In sum, I do not agree that the employer would commit an offense against the federal government by reimbursing Bourgoin for his valid medical expenses pursuant to the WCB order, especially in light of the strong presumption against preemption in this state-controlled area of workers' compensation—a domain that has

traditionally been regulated under the police powers of the states. *See Ciampi*, 681 A.2d at 8.

[¶48]  The Court also discusses the employer's offense of aiding and abetting in a vacuum, devoid of any mention of the substantive offense, which would be Bourgoin's state-law-compliant use and possession of medical marijuana. The Court points to no federal prosecution of possession of medical marijuana, let alone a federal prosecution of aiding and abetting a singular person's simple possession of medical marijuana. [12]  Because proof of the existence of a substantive crime is also an element of an aiding and abetting charge, *see Indelicato*, 611 F.2d at 385, the Court cannot reach the conclusion that the employer has aided or abetted Bourgoin's use or possession of marijuana without similarly declaring that Bourgoin's use or possession of marijuana constitutes a federal offense. This omission allows the Court to avoid a discussion that would necessarily be required to include the preemptive

---

[12] Indeed, Congress has repeatedly enjoined the Department of Justice from expending any funds to prevent states from administering their state-law-compliant medical marijuana programs. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 538, 132 Stat. 348 ("None of the funds made available under this Act to the Department of Justice may be used . . . to prevent [a state or territory] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.") (LEXIS); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 537, 131 Stat. 135 (LEXIS) (similar); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 542, 129 Stat. 2242 (LEXIS) (similar); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130 (LEXIS) (similar). To date, the injunction remains in effect. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 538, 132 Stat. 348 (making appropriations through the fiscal year ending September 30, 2018).

effect of the CSA on Bourgoin's state-law-compliant use and possession of medical marijuana. The Court uses the doctrine of aiding and abetting as the vehicle to declare that the MMUMA is preempted by the CSA in this case, but because the government would not be able to prove that the employer has the specific intent to aid or abet Bourgoin's state-law-compliant use and possession of medical marijuana, the Court's reliance on the aiding and abetting doctrine is misguided. The employer also acknowledged at oral argument that despite the fact that the first state medical marijuana law was enacted more than two decades ago in 1996,[13] and the fact that twenty-nine states, two territories, and the District of Columbia now have laws in effect that allow for the use of medical marijuana,[14] it could not point to any federal prosecution against a medical

---

[13] Cal. Health and Safety Code § 11362.5 (Deering 2018) (LEXIS).

[14] Alaska, *see* Alaska Stat. §§ 17.37.010 to .080 (LEXIS through 2017); Arizona, *see* Ariz. Rev. Stat. Ann. §§ 36-2801 to -2819 (LEXIS through First Reg. Sess. of 53rd Legis. (2017) and First Special Sess. of 53rd Legis. (2018) and Emergency Legis. from 2018 2d Reg. Sess., effective as of May 16, 2018); Arkansas, *see* Ark. Const. amend. XCVIII (LEXIS, through 2018 Fiscal Sess. and 2018 Second Extraordinary Sess.); California, *see* Cal. Health and Safety Code §§ 11362.1 to .9 (Deering 2018) (LEXIS); Colorado, *see* Colo. Const. art. XVIII, § 14 (LEXIS, through First Reg. Sess. and First Extraordinary Sess. of 71st Gen. Assembly); Connecticut, *see* Conn. Gen. Stat. §§ 21a-408 to 429 (LEXIS through Pub. Acts 18-1 through 18-6, 18-8, 18-24); Delaware, *see* Del. Code Ann. tit. 16, §§ 4901A to 4928A (LEXIS through 81 Del. Laws, ch. 253); District of Columbia, *see* D.C. Code §§ 7-1671.01 to .13 (LEXIS through June 4, 2018); Florida, *see* Fla. Stat. § 381.986 (LEXIS through 2018 Reg. Sess.); Hawaii, *see* Haw. Rev. Stat. Ann. §§ 329-121 to -131 (LEXIS through Act 12 of 2018 Sess.); Illinois, *see* 410 Ill. Comp. Stat. Ann. 130/1 to /999 (LEXIS through P.A. 100-585 of the 100th Legis. Sess.); Maine, *see* 22 M.R.S. §§ 2421 to 2430-B (2017); Maryland, *see* Md. Code Ann., Misc. Health Care Programs §§ 13-3301 to -3316 (LEXIS through June 1, 2018); Massachusetts, *see* Mass. Ann. Laws ch. 94D, §§ 1-3 (LEXIS through Act 98 of the 2018 Legis. Sess.); Michigan, *see* Mich. Comp. Laws Serv. §§ 333.26421 to .26430 (LEXIS through 2018 Pub. Act 170); Minnesota, *see* Minn. Stat. §§ 152.22 to .37 (LEXIS through ch. 118 (excluding portions of chs. 103, 113, and 115 of 2018 Reg.

provider for authorizing a patient to use marijuana for medicinal purposes, much less to an employer or insurance carrier providing reimbursement for authorized medical marijuana treatment. It is speculative to anticipate a federal prosecution of an employer who reimburses an employee for medical expenses pursuant to a WCB order mandating it to do so.

[¶49] Because I would hold that there is no positive conflict between the CSA and the MMUMA in this case, I address the remainder of the employer's arguments on appeal.

---

Sess. of Minn. 90th Legis.)); Montana, *see* Mont. Code Ann. §§ 50-46-301 to -345 (LEXIS through 2017 Reg. Sess. of 65th Legis. and Nov. 2017 Special Sess.); Nevada, *see* Nev. Rev. Stat. Ann. §§ 453A.010 to .810 (LEXIS through chs. 1-505, 507-560, 562-565, 567, 569, 572-587, 589-608 of 79th Reg. Sess. (2017)); New Hampshire, *see* N.H. Rev. Stat. Ann. §§ 126-X:1 to :11 (LEXIS through Act 48 of 2018 Reg. Sess.); New Jersey, *see* N.J. Stat. Ann. §§ 24:6I-1 to -16 (LEXIS through 218th First Annual Sess., L. 2018, c. 15 and J.R. 5); New Mexico, *see* N.M. Stat. Ann. §§ 26-2B-1 to -7 (LEXIS through 2018 Reg. Sess. enactments of 53rd Legis.); New York, *see* N.Y. Pub. Health Law §§ 3360 to 3369-e (LEXIS through 2018 chs. 1-47, 50-58); North Dakota, *see* N.D. Cent. Code §§ 19-24.1-01 to -40 (LEXIS through end of 2017 Reg. Legis. Sess.); Ohio, *see* Ohio Rev. Code Ann. §§ 3796.01 to .30 (LEXIS through Legis. passed by 132nd Gen. Assembly and filed with Sec'y of State through file 66 (HB 354)); Oregon, *see* Or. Rev. Stat. §§ 475.300 to .375 (LEXIS through emergency legis. through chs. 1-50, 52-59, 62-71, 73-92 of 2018 Legis. Sess.); Pennsylvania, *see* 35 Pa. Cons. Stat. §§ 10231.101 to .2110 (LEXIS through 2018 Reg. Sess. Acts 1-21); Rhode Island, *see* 21 R.I. Gen. Laws §§ 21-28.6-1 to -17 (LEXIS through ch. 28 of Jan. 2018 Sess.); Vermont, *see* Vt. Stat. Ann. tit. 18, §§ 4471 to 4474m (LEXIS through ch. 110 and Municipal Act 15 of the 2017 Adjourned Sess. (2018)); Washington, *see* Wash. Rev. Code Ann. §§ 69.51A.005 to .903 (LEXIS through 2018 ch. 6); West Virginia, *see* W. Va. Code Ann. §§ 16A-1-1 to -16-1 (LEXIS through 2018 Reg. Sess. Legis.); Guam, *see* 10 Guam Code Ann. §§ 122501 to 122529 (LEXIS through P.L. 34-71, 12/15/2017); Puerto Rico, *see* 9000 PR Regla 8686 (LEXIS through rules received before January 23, 2018).

C.      Private Health Insurers

[¶50]  The employer argues that the plain language contained in section 2426(2)(A) of the MMUMA demonstrates a legislative intent that no third party should be required to reimburse a person for their use of medical marijuana. *See* 22 M.R.S. § 2426(2)(A) (2017).   We review issues of statutory interpretation de novo. *See Estate of Sullwold v. Salvation Army*, 2015 ME 4, ¶ 7, 108 A.3d 1265.

[¶51]  "The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature."  *State v. Hudson*, 470 A.2d 786, 788 (Me. 1984). "[A] well-settled rule of statutory interpretation states that express mention of one concept implies the exclusion of others not listed."  *Musk v. Nelson*, 647 A.2d 1198, 1201 (Me. 1994); s*ee also Lee v. Massie*, 447 A.2d 65, 68 (Me. 1982) ("[T]he maxim [of] *expressio unius est exclusio alterius* . . . is regarded as well recognized in Maine . . . . " (quotation marks omitted)).  We only "look beyond the plain meaning and consider other indicia of legislative intent" if "the statutory language is ambiguous."  *Damon v. S.D. Warren Co.*, 2010 ME 24, ¶ 10, 990 A.2d 1028.

[¶52]  The MMUMA states that it "may not be construed to require . . . [a] government medical assistance program or private health insurer to reimburse

a person for costs associated with the medical use of marijuana." 22 M.R.S. § 2426(2)(A). The MMUMA does not define "private health insurer." *See* 22 M.R.S. § 2422 (2017). However, the Workers' Compensation Act (WCA) defines "employer," "[i]f the employer is insured," to include "the insurer, self-insurer or group self-insurer." 39-A M.R.S. § 102(12) (2017). Under the WCA, "insurance company" is separately defined as "any casualty insurance company or association authorized to do business in this State that may issue policies" and does not include employers. *Id*. § 102(14). *See, e.g.*, *Deabay v. St. Regis Paper Co.*, 442 A.2d 963, 964 (Me. 1982) (distinguishing between private health insurers and self-insured employers under the WCA).

[¶53] We must first look to the plain meaning of "private health insurer" under the MMUMA and construe that language to avoid an absurd, inconsistent, or illogical result. *See Hanson v. S.D. Warren Co.*, 2010 ME 51, ¶ 12, 997 A.2d 730. Read in conjunction with the entire sentence within which the phrase is contained, there exist only two categories of third parties that should be exempt from paying for the use of medical marijuana: government medical assistance programs or private health insurers. The use of the disjunctive word "or" between the two types of third parties, and the absence of any other potential third-party payors, indicates the intent to set forth an exhaustive list of third

parties exempt from reimbursement, consistent with the statutory interpretation canon of *expressio unius*. *See Musk*, 647 A.2d at 1201; *see also Lee*, 447 A.2d at 68. Employers, including those that are self-insured, are not the functional equivalents to otherwise private health insurers. I would hold that for the purposes of WCA claims, "private health insurers" is unambiguous as used in the MMUMA and does not include self-insured employers for purposes of compensation under the WCA.

D.    Reasonable and Proper Treatment

[¶54]  The employer argues that medical marijuana is not a reasonable and proper form of treatment under the WCA because it is illegal under the CSA; it has not been shown to have an accepted level of safety; there is no control over the quality of the substance; and there is no control over its billing. We review issues of statutory interpretation de novo. *See Estate of Sullwold*, 2015 ME 4, ¶ 7, 108 A.3d 1265.

[¶55]  "When construing provisions of the Workers' Compensation Act, our purpose is to give effect to the Legislature's intent." *Graves v. Brockway-Smith Co.*, 2012 ME 128, ¶ 9, 55 A.3d 456 (quotation marks omitted). Pursuant to the WCA, "[a]n employee sustaining a personal injury arising out of and in the course of employment . . . is entitled to reasonable and proper

medical, surgical and hospital services, nursing, medicines, and mechanical, surgical aids, as needed, paid for by the employer." 39-A M.R.S. § 206 (2017).

[¶56]  The WCA does not define what "reasonable and proper" means. *See generally* 39-A M.R.S. § 102 (2017).  However, we have held that the "reasonable and proper" language contained within the WCA is "unambiguous on its face" and that "the Legislature sought to provide payment by the employer for all reasonable and proper medical . . . services . . . required by an employee sustaining a personal injury arising out of and in the course of his employment."[15]  *Cote v. Georgia-Pacific Corp.*, 596 A.2d 1004, 1005 (Me. 1991) (quotation marks omitted).  When determining whether a particular medical expense is "reasonable and proper" under the WCA, we have stated that "[e]ach case must be decided according to *its own particular facts* and according to the statute's ultimate purpose to provide reasonable relief from the effects of a work-related injury."  *Brawn v. Gloria's Country Inn*, 1997 ME 191, ¶ 11, 698 A.2d 1067 (emphasis added).  *See, e.g.*, *id.* ¶¶ 10, 15 (holding that a part-time assistant and van to accommodate a wheelchair were reasonable and

---

[15]  Before 1992, the WCA's "reasonable and proper" language was contained in 39 M.R.S.A. § 52 (1964), but after the Act was overhauled in 1992, the same language became part of section 206; although the language moved, it has retained the same meaning.  *See* P.L. 1991, ch. 885, § A-8 (effective Oct. 7, 1992); *see also* L.D. 2464, Statement of Fact, Part A, at 211 (115th Legis. 1992) ("Section 206 reorganizes and substantially enacts the provisions of the former Title 39, section 52 . . . .").

proper when medically necessary for that particular employee); *Cote*, 596 A.2d at 1005-06 (holding that housekeeping was not reasonable and proper when it had no accompanying medical component); *Archer v. MDS Bldg., Inc.*, 2004 ME 17, ¶¶ 2, 6, 841 A.2d 801 (holding that elective amputation of a toe to replace a thumb lost in a work injury was reasonable and proper because the amputation was a "direct consequence" of reasonable and proper treatment).

[¶57] Turning to the particular facts of Bourgoin's own case, Bourgoin suffers from severe chronic pain syndrome, which includes symptoms of pain and muscle spasms in his back, legs, arms, and chest. Bourgoin has attempted many treatments since he was placed on total disability in 1989, including nerve blocks, aquatherapy, and pain management through opioid medication. Eventually, the continued use of opioid medication resulted in severe negative side effects, including narcotic dependence, with dependency dating as far back as the 1990s, and suicidal ideation. The hearing officer found that strong narcotic medications "have already been tried and they have failed Mr. Bourgoin miserably." As a result, and after consultation with his psychiatrist, his primary doctor recommended ceasing narcotic medications, and in January of 2012, Bourgoin obtained a medical marijuana certification from a physician. Bourgoin has used medical marijuana since his certification

to successfully treat his chronic pain, and the hearing officer found that Bourgoin "has experienced significant benefit from medical marijuana, and that opioids have already been shown to be a failure."

[¶58]  With no reference to the "particular facts" of Bourgoin's case, the employer here argues that medical marijuana is per se unreasonable and improper for Bourgoin because possession of marijuana is unlawful under the CSA.  I would decline to adopt this argument and would conclude that medical marijuana was reasonable and proper here based on the particular facts of Bourgoin's own case, as established by the record before us.  Specifically, the severity and chronic nature of his pain, his many and varied attempts to try different treatments, none of which were effective, and the ultimate effectiveness of medical marijuana for his particular situation, show that the medical use of marijuana was reasonable and proper in this case.

E.    Rejection of IME's Findings

[¶59]  The employer argues that there was not clear and convincing evidence to contradict the independent medical examiner's (IME) findings, and that the hearing officer's analysis was flawed because it failed to consider

whether medical marijuana can ever be reasonable "given its illegality under the CSA."

[¶60] A hearing officer must adopt the medical findings of the IME "unless there is clear and convincing evidence to the contrary in the record that does not support the medical findings." 39-A M.R.S. § 312(7) (2017). Although a hearing officer's decision "on all questions of fact is final," a hearing officer's conclusion that an employee satisfied his or her burden to prove by clear and convincing evidence that the independent medical examiner's findings should be rejected is a conclusion of law that is subject to appellate review. 39-A M.R.S. § 318 (2017).[16] In such a case, "we determine whether the hearing officer could have been reasonably persuaded by the contrary medical evidence that it was highly probable that the record did not support the IME's medical findings." *Sprague v. Lucas Tree Experts*, 2008 ME 162, ¶ 24, 957 A.2d 969 (quotation marks omitted).

[¶61] In this case, the hearing officer found it to be highly probable that the record did not support the IME's findings. Specifically, the hearing officer was persuaded by the testimony of Dr. Sulak regarding the benefits of

---

[16] Certain portions of the WCA, including 39-A M.R.S. § 318 (2017), were amended after the decree in this case was entered, *see, e.g.*, P.L. 2015, ch. 297, § 13 (effective Oct. 15, 2015), though not in any way relevant to this discussion.

marijuana for the treatment of long-term, chronic pain, and Bourgoin's own testimony regarding the effects of marijuana on his level of pain. The hearing officer found this evidence to be more persuasive than the IME's findings. The IME concluded that, because medical marijuana had no currently accepted medical use under federal law, it was not a reasonable and proper treatment for any patient, regardless of its efficacy in a given circumstance.

[¶62] Because the record contains (1) numerous examples of the ways in which medical marijuana has reduced Bourgoin's chronic pain since beginning the regimen of medical marijuana use; and (2) evidence of traditional opioid medication's failure to reduce his chronic pain, I would hold that the hearing officer could have been reasonably persuaded by the contrary medical evidence, and, as a result, that he did not err when he concluded that it was highly probable that the record did not support the IME's medical findings.

[¶63] Accordingly, I would affirm the decision of the Appellate Division.

ALEXANDER, J., dissenting.

[¶64] I am pleased to join Justice Jabar's thoroughly researched and carefully written dissenting opinion. I write separately because in the extensive

discussion of the law of preemption, we must not lose sight of the injured worker whom this opinion is really about.

[¶65]  Gaetan Bourgoin has endured chronic, disabling pain from a workplace injury he sustained three decades ago.  The result of the Court's opinion today is to deprive Bourgoin of reimbursement for medication that has finally given him relief from his chronic pain, and to perhaps force him to return to the use of opioids and other drugs that failed to relieve his pain and may have placed Bourgoin's life at risk.

[¶66]  The essential elements of this appeal are that other states allow appropriate medical personnel to prescribe or certify marijuana to treat health conditions; these states allow employers and private insurers to reimburse for marijuana prescriptions or certificates; and the certificates and reimbursements are technically violations of federal law, but the federal government has not taken criminal or civil action to prevent these certifications or reimbursements or at least no such federal prosecution is indicated in the record.

[¶67]  Based on the status of the law in 2016, the Appellate Division approved the certificates and the reimbursements.  The Court's opinion rejects the Appellate Division's findings and, based on its speculation that federal

enforcement practice might change, the Court holds as a matter of law that the Appellate Division erred in approving the certificates and reimbursements for Mr. Bourgoin.  Court's Opinion ¶¶ 26-30.  In this, the Court is reaching too far, speculating about the future rather than looking at the present, as was properly addressed by the Appellate Division.

[¶68]  From that result, I respectfully dissent.

_____

Anne-Marie L. Storey, Esq. (orally), and John K. Hamer, Esq., Rudman Winchell, Bangor, for appellants Twin Rivers Paper Company, LLC, and Sedgwick Claims Management Services

Norman G. Trask, Esq. (orally), Currier & Trask, P.A., Presque Isle, for appellee Gaetan H. Bourgoin

Thomas E. Getchell, Esq., Troubh Heisler, Portland, for amicus curiae University of Maine System

Workers Compensation Board Appellate Division case number 15-0022
FOR CLERK REFERENCE ONLY